# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ATLANTIC RECORDING CORPORATION;
ATLANTIC MUSIC GROUP LLC; BAD
BOY RECORDS LLC; ELEKTRA
ENTERTAINMENT LLC; ELEKTRA
ENTERTAINMENT GROUP INC.; FUELED
BY RAMEN LLC; WARNER MUSIC
INTERNATIONAL SERVICES LIMITED;
WARNER RECORDS INC.; WARNER
RECORDS LLC; SONY MUSIC
ENTERTAINMENT; ARISTA MUSIC;
ARISTA RECORDS, LLC; ZOMBA
RECORDING LLC; UMG RECORDINGS,
INC.; CAPITOL RECORDS, LLC; and
SPOTIFY USA INC.,

          Plaintiffs,

     v.

ANNA'S ARCHIVE and DOES 1-10,

          Defendants.

No.

**COMPLAINT FOR:**

   **(1) Direct Copyright Infringement**

   **(2) Breach of Contract**

   **(3) Violation of the Computer Fraud
       and Abuse Act, 18 U.S.C. § 1030**

   **(4) Violation of the Digital
       Millennium Copyright Act,
       17 U.S.C. § 1201**

**JURY TRIAL DEMANDED**

**[FILED UNDER SEAL]**

Plaintiffs Atlantic Recording Corporation, Atlantic Music Group LLC, Bad Boy Records

LLC, Elektra Entertainment Group Inc., Elektra Entertainment LLC, Fueled by Ramen LLC,

Warner Music International Services Limited, Warner Records Inc., Warner Records LLC, Sony

Music Entertainment, Arista Music, Arista Records, LLC, Zomba Recording LLC, UMG

Recordings, Inc., and Capitol Records, LLC (collectively, the "Record Company Plaintiffs"), and

Spotify USA Inc. ("Spotify," and together with the Record Company Plaintiffs, "Plaintiffs"), by

and through their undersigned counsel, for their Complaint against Defendants Anna's Archive

("Anna's Archive") and Does 1-10 (together with Anna's Archive, "Defendants"), allege as

follows:

## INTRODUCTION

1.      This action arises out of the brazen theft of millions of files containing nearly all of the world's commercial sound recordings by a group of anonymous Internet pirates with no regard for the law.  By its own admission, Anna's Archive—a decentralized group of online piracy websites formerly known as the "Pirate Library Mirror"—has illegally "scraped" (*i.e.*, copied) metadata for about 256 million audio tracks (*e.g.*, artist, album, and track name) and 86 million music files from Spotify, one of the world's leading audio streaming services; according to Anna's Archive, the sound recordings contained in those files account for 99.6% of all "listens" on Spotify.  Anna's Archive has already released the metadata it unlawfully scraped, heralding it as "the largest publicly available music metadata database."  Even more alarmingly, Anna's Archive has threatened to imminently mass-release and freely distribute its pirated copies of the sound recording files to the public, without authorization from or compensation to the relevant rights holders.  Such widespread and illegal infringement would irreparably harm the music industry, including by materially interfering with the Record Company Plaintiffs' right and ability to control their music catalog and to charge a fair market rate for their music, and by undermining the rights of the Record Company Plaintiffs' licensees, like Spotify, to exploit their licenses and generate revenue from the Record Company Plaintiffs' works.

2.      As is clear from its original name—the "Pirate Library Mirror"—Anna's Archive has only one purpose:  to illegally obtain, reproduce, distribute, and profit from copyrighted content without obtaining licenses or compensating authors, artists, or other copyright holders.  For years, Anna's Archive has facilitated the unlawful reproduction and distribution of copyrighted books and academic papers.

3.      Now, Anna's Archive has expanded its illegal enterprise from written

publications to music.  Anna's Archive has threatened to make the music files it illegally scraped from Spotify publicly available in a series of mass releases on BitTorrent, a peer-to-peer file sharing network widely used for Internet piracy.  This is a calculated effort to flagrantly undermine and interfere with Plaintiffs' rights and to attract notoriety and spur "donations" for Anna's Archive.

4.      On information and belief, Anna's Archive circumvented Spotify technological measures by first surreptitiously accessing and downloading the music files at issue from Spotify using thousands of accounts, and then by circumventing the technological measures Spotify uses to protect audio files from unauthorized access.  Anna's Archive's conduct was illegal from start to finish and violated multiple provisions of the Copyright Act, as well as Spotify's Terms of Use and the Computer Fraud and Abuse Act.  Plaintiffs now bring this action to remedy the harm caused by Anna's Archive's theft of millions of music files from Spotify and to stop Anna's Archive's mass release and distribution of those files to the public.

## THE PARTIES AND THE COPYRIGHTED SOUND RECORDINGS

5.      Plaintiff Atlantic Music Group LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York.

6.      Plaintiff Atlantic Recording Corporation is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York.

7.      Plaintiff Bad Boy Records LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York.

8.      Plaintiff Elektra Entertainment Group Inc. is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York.

9.      Plaintiff Elektra Entertainment LLC is a Delaware limited liability company with

its principal place of business at 1633 Broadway, New York, New York.

10.     Plaintiff Fueled by Ramen LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York.

11.     Plaintiff Warner Music International Services Limited is a limited company organized and existing under the laws of England and Wales, with its principal place of business at 27 Wrights Lane, London, England.

12.     Plaintiff Warner Records Inc. is a Delaware corporation with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California.

13.     Plaintiff Warner Records LLC is a Delaware limited liability company with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California.

14.     Plaintiff Sony Music Entertainment is a Delaware general partnership with its principal place of business at 25 Madison Avenue, New York, New York.

15.     Plaintiff Arista Music is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York.

16.     Plaintiff Arista Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York.

17.     Plaintiff Zomba Recording LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York.

18.     Plaintiff UMG Recordings, Inc. is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California, and with substantial offices in New York, New York.

19.     Plaintiff Capitol Records, LLC is a Delaware limited liability company with its principal place of business at 2220 Colorado Avenue, Santa Monica, California, and with an

office in New York, New York.

20.     Plaintiff Spotify USA Inc. is a Delaware corporation with its principal place of business at 150 Greenwich Street, 4 World Trade Center, New York, New York.

21.     Defendant Anna's Archive, formerly known as Pirate Library Mirror, holds itself out as a non-profit organization. By its own admission, Anna's Archive—as an organization dedicated to online piracy—"need[s] to stay anonymous."[1]  Accordingly, its incorporation status and principal place of business are unknown.

22.     Defendants Does 1-10 are individuals who own and/or operate Anna's Archive and who are responsible for the illegal conduct alleged herein.  Plaintiffs currently are unaware of the true names of the Defendants sued herein by the fictitious designations Does 1-10 and, for that reason, sue them by those designations. Plaintiffs will seek leave to amend this Complaint to identify Does 1-10 when their true names are known.

23.     The Record Company Plaintiffs own or control the copyrights or exclusive U.S. rights in many popular sound recordings.

24.     The Record Company Plaintiffs either own the copyrights or have exclusive U.S. rights under copyright (*e.g.*, reproduction, digital transmission, and distribution rights) in the sound recordings listed in **Exhibit A** (the "Copyrighted Sound Recordings"), as reflected in greater detail in Exhibit A. The sound recordings reflected in Exhibit A are not exhaustive of the recordings owned or exclusively controlled by the Record Company Plaintiffs that Anna's Archive has infringed, but are provided as an illustrative sample.

25.     The Copyrighted Sound Recordings are registered with the U.S. Copyright Office.

26.     At the time of the infringements at issue here, the Copyrighted Sound Recordings

---

[1] *How to Run a Shadow Library: Operations at Anna's Archive*, ANNA'S ARCHIVE, https://annas-archive.org/blog/how-to-run-a-shadow-library.html (last visited December 28, 2025).

were available for users to stream on Spotify in the United States.

## JURISDICTION AND VENUE

27.     The Record Company Plaintiffs bring a claim against Defendants for direct copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201.  Spotify brings claims against Defendants under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the DMCA.  The Court has original subject matter jurisdiction over these federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

28.     Spotify also brings a state law claim against Defendants for breach of contract. The Court has supplemental jurisdiction over Spotify's state law breach of contract claim pursuant to 28 U.S.C. § 1367 because this claim is so related to the federal claims in this action that it forms part of the same case or controversy under Article III of the United States Constitution.

29.     The Court has personal jurisdiction over Anna's Archive pursuant to New York Civil Practice Law and Rule ("CPLR") § 302(a)(1) because Anna's Archive transacts business in New York State, including, on information and belief, accepting payment from New York residents.

30.     The Court also has personal jurisdiction over Anna's Archive pursuant to CPLR § 302(a)(3).  On information and belief, Anna's Archive is operated by individuals who reside outside of the United States and who committed the tortious acts that give rise to Plaintiffs' claims outside of New York.  These tortious acts caused injury within New York to Plaintiffs that maintain their principal place of business in, or conduct substantial business in, the state.

31.     Pursuant to CPLR § 302(a)(3)(i), Anna's Archive regularly does or solicits

business in New York State, engages in a persistent course of conduct in New York State, and derives substantial revenue from services rendered in New York State. Specifically, on information and belief, Anna's Archive distributes copyrighted content to New York State residents without authorization, and further accepts payments from New York residents in exchange for faster illegal downloads of copyrighted content.

32.    Pursuant to CPLR § 302(a)(3)(ii), Anna's Archive expects or should reasonably expect that its tortious acts would have consequences in New York State, because Anna's Archive's conduct has caused injury to Plaintiffs who maintain their principal places of business in, or conduct substantial business in, the state, and, if Anna's Archive carries out its threat to mass release the pirated music files, the Copyrighted Sound Recordings will be downloaded by and distributed to New York residents. Anna's Archive also derives substantial revenue from interstate or international commerce.

33.    Alternatively, the Court has personal jurisdiction over Anna's Archive pursuant to Federal Rule of Civil Procedure 4(k)(2) because this action involves claims that arise under federal law and Anna's Archive has targeted its unauthorized distribution of copyrighted material to a United States audience and is visited millions of times each month by users in the United States. On information and belief, Anna's Archive has also accepted payment from users in the United States, transacted with third parties in the United States, and engaged in the unauthorized reproduction and distribution of copyrighted works in the United States. Furthermore, according to data from the website tracking service Similarweb, the three primary websites that comprise Anna's Archive collectively have over 40 million monthly visitors, nearly 20 percent of whom are in the United States. More of Anna's Archive's users are in the United States than are in any other country, making the United States Anna's Archive's single largest market.

34.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a), including because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Anna's Archive is subject to personal jurisdiction in this District and thus may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(c)(1) because, on information and belief, Anna's Archive is not a resident of the United States.

## FACTUAL BACKGROUND

I.     **Anna's Archive Is a Notorious Pirate Website That Illegally Reproduces and Distributes Copyrighted Works on a Massive Scale.**

35.     Anna's Archive operates what it describes as "the world's largest shadow library" and claims to host over "61,344,044 books" and "95,527,824 papers."[2]  Shadow libraries, also referred to as pirate libraries, are websites that host or direct users to copyrighted content, such as books, movies, or music, without authorization from or compensation to copyright owners.  On information and belief, almost all of the books and papers available on Anna's Archive are copyrighted works that Anna's Archive has illegally reproduced and/or is illegally distributing.

36.     Because they know they are violating the law, the pirates who operate Anna's Archive remain anonymous, referring to themselves with the pseudonym "Anna."  The operators of Anna's Archive note that those who operate pirate libraries are "at high risk of being arrested" and "could face decades of prison time."  As a result, they are "very careful not to leave any trace" and have "strong operational security."[3]  On information and belief, the individuals who operate Anna's Archive are located outside of the United States.

37.     Anna's Archive is currently accessible through three Internet domains: annas-

---

[2] *Anna's Blog*, ANNA'S ARCHIVE, https://annas-archive.org/blog/ (last visited December 28, 2025).
[3] *How to Become a Pirate Archivist*, ANNA'S ARCHIVE, https://annas-archive.org/blog/blog-how-to-become-a-pirate-archivist.html (last visited December 28, 2025).

archive.org, annas-archive.li, and annas-archive.se.  The ".li" top-level domain is reserved for the country of Liechtenstein, and the ".se" top-level domain is reserved for the country of Sweden. However, it is not necessary for a website operator to have any association with either country to acquire and use these domain names.  On information and belief, Anna's Archive anonymously registered these websites using various private, foreign domain registrars.

38.    Anna's Archive was originally launched in July 2022 as the "Pirate Library Mirror" to replace another pirate library, Z-Library.  Its first project was to "mirror," or copy, Z-Library, a "popular (and illegal) library."[4]  By October 2022, Anna's Archive had over 10 million files available from Z-Library and another pirate library, Library Genesis.[5]  From the beginning, Anna's Archive recognized that operating a "shadow library" was illegal, forthrightly stating that "*[w]e deliberately violate the copyright law* in most countries."[6]

39.    Anna's Archive's stated "goals" are ostensibly "[p]reservation" and "[a]ccess." In fact, these terms are simply euphemisms for "illegally reproduce and distribute."  The method Anna's Archive uses to purportedly "preserve" copyrighted content is "wide distribution," *i.e.*, "making it easy to duplicate in bulk – using torrents – resulting in many copies around the world."[7]  Similarly, "access" means allowing "anyone" to "easily and freely" download copyrighted content, without authorization from or compensation to authors, artists, publishers, or other copyright holders.[8]

40.    These purported goals are little more than window-dressing for plain and simple

---

[4] *Introducing the Pirate Library Mirror*, ANNA'S ARCHIVE, https://annas-archive.org/blog/blog-introducing.html (last visited December 28, 2025).
[5] *ISBNdb Dump, or How Many Books Are Preserved Forever?*, ANNA'S ARCHIVE, https://annas-archive.org/blog/blog-isbndb-dump-how-many-books-are-preserved-forever.html (last visited December 28, 2025).
[6] *Introducing the Pirate Library Mirror*, ANNA'S ARCHIVE, https://annas-archive.org/blog/blog-introducing.html (last visited December 28, 2025) (emphasis added).
[7] *Frequently Asked Questions (FAQ)*, ANNA'S ARCHIVE, https://annas-archive.org/faq/ (last visited December 28, 2025).
[8] *Id.*

Internet piracy, that is, illegally reproducing and distributing copyrighted content on a massive scale. Anna's Archive initially limited its infringement to "written materials like books." However, it has repeatedly referenced plans to "expand into other types of media," including "papers, audiobooks, movies, tv shows [and] magazines."[9]

41.     Anna's Archive allows users to search for files in its illegal pirate library and provides a list of links to "Partner Server[s]" that allow users to download the file. These links begin with the domain name for Anna's Archive. Anna's Archive is also directly involved in reproducing and distributing copyrighted content, both in actively hosting copyrighted content and by relying heavily on the BitTorrent protocol. BitTorrent is an especially pernicious form of peer-to-peer ("P2P") file sharing overwhelmingly used to illegally reproduce and distribute copyrighted material.

42.     Users access BitTorrent using software referred to as a "client." BitTorrent clients connect users to a network of other peers using BitTorrent, collectively referred to as a "swarm," who can upload and download the content that each is hosting. BitTorrent divides files into "pieces," and users can download different "pieces" of a file from multiple different users simultaneously. A user who has every piece of a particular file available is known as a "seed" for that file.

43.     A user who wishes to download content using BitTorrent must obtain a "torrent" file, which allows a client to match the content to peers in the swarm who are seeding the content or have pieces of it. A torrent can either identify a single file for download or, more commonly, a group of files. When a user runs a torrent file, their BitTorrent client connects their computer

---

[9] *Introducing the Pirate Library Mirror*, ANNA'S ARCHIVE, https://annas-archive.org/blog/blog-introducing.html (last visited December 28, 2025); *ISBNdb Dump, or How Many Books Are Preserved Forever?*, https://annas-archive.org/blog/blog-isbndb-dump-how-many-books-are-preserved-forever.html (last visited December 28, 2025).

with peers to download pieces of the relevant file or files until the download is complete.  Given this structure, distribution of content through the BitTorrent network tends to be "viral," in that the content can spread quickly and widely across the Internet, reaching a massive audience in a very short time.

44.    Anna's Archive routinely tracks the availability of copyrighted content on BitTorrent, facilitating infringing downloads; creates and distributes torrent files that enable BitTorrent users to illegally download copies of copyrighted works; and "seeds" (*i.e.*, supplies) infringing content on BitTorrent for distribution to and download by others.  Anna's Archive maintains a "Torrents" page where users can download numerous torrent files, including a torrent for the copyrighted books it downloaded from Z-Library.[10]  Users of Anna's Archive are also explicitly invited to "help out" by "seeding torrents."[11]

45.    Anna's Archive also profits from its illegal conduct.  It solicits users to provide anonymous "donations" of between $2 per month and $100 per month using untraceable methods such as gift cards or cryptocurrency.  For the copyrighted content hosted directly by Anna's Archive, download speeds for free users on Anna's Archive are typically very slow. However, in exchange for a "donation," users receive "fast downloads" and avoid waitlists. Given the volume of the pirated files Anna's Archive encourages its users to download, buying this extra download speed is a practical necessity.  Anna's Archive also solicits "[e]nterprise-level donation[s]" in exchange for "[u]nlimited high-speed access" and other services.[12]  In reality, these "donations" are paid memberships, and Anna's Archive explicitly refers to donations as "memberships" on its FAQ page.[13]

---

[10] *Torrents*, ANNA'S ARCHIVE, https://annas-archive.org/torrents/ (last visited December 28, 2025).
[11] ANNA'S ARCHIVE, https://annas-archive.org/ (last visited December 28, 2025).
[12] *Donate*, ANNA'S ARCHIVE, https://annas-archive.org/donate/ (last visited December 28, 2025).
[13] *Frequently Asked Questions (FAQ)*, https://annas-archive.org/faq (last visited December 28, 2025).

**II.    Spotify Is an Authorized Licensee of the Copyrighted Sound Recordings and Protects Them Using Digital Rights Management and Its Terms of Service.**

46.    Spotify is one of the most popular audio streaming services in the world, with over 713 million users and 281 million subscribers.  Spotify hosts more than 100 million tracks, seven million podcast titles, and 350,000 audiobooks.  Spotify's software, infrastructure, and servers provide access to millions of users across the United States and the world.  Spotify not only has millions of users in states from New York to California, but is available in more than 180 markets globally.[14]

47.    Spotify users can access music, podcasts, and audiobooks through its website or applications for mobile phones, computers, and other devices.  In addition to streaming content in real time, Spotify allows Premium subscribers to store audio files for offline playback through Spotify applications tied to a user's subscription (*i.e.*, if a user's subscription lapses, then so does access to the user's stored files).[15]

48.    At the time of the infringements at issue here, the Record Company Plaintiffs had licensed copyrighted works that they own or control, including without limitation the Copyrighted Sound Recordings, to Spotify, which had made such sound recordings available to authorized users to stream through its platform.

49.    Spotify receives revenue through advertisements and through paid Premium subscriptions.  The cost of Spotify Premium in the United States ranges from $5.99 per month for a Student subscription to $19.99 per month for a Family subscription, which provides access to six family members residing at the same address.[16]

50.    Spotify pays copyright owners (like the Record Company Plaintiffs) and other

---

[14] *About Spotify*, Spotify, https://newsroom.spotify.com/company-info/ (last visited December 28, 2025).

[15] *Listen Offline*, Spotify, https://support.spotify.com/us/article/listen-offline/ (last visited December 28, 2025).

[16] *Premium*, Spotify, https://www.spotify.com/us/premium/ (last visited December 28, 2025).

participants in the music industry in exchange for licenses to reproduce and digitally transmit music on and through its platform.  In 2024 alone, Spotify paid $10 billion to the music industry, more than any other retailer or streaming service, and Spotify has paid $60 billion to the music industry since its inception.[17]

51.      Legal streaming services like Spotify provide widespread authorized access to copyrighted content, while simultaneously taking measures to protect the value of this content. These measures are crucial to Spotify's business model and the economics of the music industry.

52.      Spotify users are required to create an account to access content.  As part of the account creation process, users must agree to Spotify's Terms and Conditions of Use, including the Terms of Use and the User Guidelines attached hereto as **Exhibits B and C**, respectively.

53.      The Terms of Use and User Guidelines are referred to herein as the "Spotify Terms."  The Spotify Terms include provisions to protect Spotify's software and copyrighted content available on Spotify, including the Record Company Plaintiffs' copyrighted sound recordings that are offered through the Spotify service.

54.      Spotify also implements a variety of technological measures to protect copyrighted works and prevent users from accessing, reproducing, digitally transmitting, or distributing the copyrighted works without authorization.  These technological measures are crucial, because they allow users to easily listen to music while protecting copyright holders' rights.  In particular, Spotify applies encryption and other digital rights management ("DRM") protection to effectively control access to protected works.

55.      The Spotify Terms also prohibit users from accessing, reproducing, or distributing content available on Spotify, "scraping" Spotify to download content, or circumventing the

---

[17] *Our Annual Music Economics Report*, SPOTIFY, https://loudandclear.byspotify.com/#takeaway-1/ (last visited December 28, 2025).

technological measures that Spotify uses to protect content.

56.    In particular, the User Guidelines prohibit:

a.    "*[C]opying*, *reproducing*, *redistributing*, *'ripping,'* recording, *transferring*, performing, framing, linking to or displaying to the public, broadcasting, or making available to the public, or any other use which is not expressly permitted under the Agreements or applicable law, or which otherwise infringes intellectual property rights . . . ."  Ex. C ¶ 2 (emphasis added).

b.    "*[I]mporting or copying* any local files that you do not have the legal right to import or copy in this way . . . ."  *Id.* ¶ 3 (emphasis added).

c.    "*[T]ransferring* copies of cached Content from an authorized Device to any other Device via any means . . . ."  *Id.* ¶ 4 (emphasis added).

d.    "*'[C]rawling' or 'scraping'*, whether manually or by automated means, or otherwise using any automated means (including bots, scrapers, and spiders), to view, access or collect information . . . ."  *Id.* ¶ 5 (emphasis added).

e.    "*[C]ircumventing* any technology used by Spotify, its licensors, or any third party, including any territorial or other content access restrictions applied by Spotify or its licensors . . . ."  *Id.* ¶ 9 (emphasis added).

57.    In sum, Spotify has implemented technological measures to prevent users from accessing Spotify's services, prevent automated downloading or scraping of audio files and metadata, and protect audio files through application of encryption and DRM technology.  The purpose of these measures is to prevent illegal access, copying, and distribution of copyrighted content without authorization. The Spotify Terms expressly prohibit users from circumventing these measures or illegally accessing, copying, and distributing such content.

**III.    Anna's Archive Has Illegally Accessed and Downloaded 86 Million Music Files From Spotify and Plans to Imminently Distribute Them Using BitTorrent.**

58.    Anna's Archive recently announced that it is expanding its illegal reproduction and distribution of copyrighted content beyond books and printed media into music.  On December 20, 2025, Anna's Archive published a blog post stating that it had "discovered a way to scrape Spotify at scale" and "archived around 86 million music files, representing around 99.6% of listens."  Anna's Archive's December 20, 2025, blog post (available at https://annas-archive.li/blog/backing-up-spotify.html) is attached hereto as Exhibit D.

59.    "Scraping" refers to accessing and copying data and files from websites, often by using software to automatically extract large volumes of information without authorization and without detection.  As discussed above, the Spotify Terms specifically prohibit scraping, and Anna's Archive could not "scrape" music files without taking steps to circumvent technological measures, including Spotify's encryption and DRM technology.

60.    On information and belief, Anna's Archive unlawfully used functionality in a Spotify application programming interface ("API") to unlawfully scrape metadata and music files.  The API is an interface that, among other things, allows developers to build apps and services that interact with the Spotify platform over the Internet

61.    On information and belief, Anna's Archive used accounts to access without authorization and engage in coordinated, automated scraping activity of millions of audio files and related metadata through unauthorized use of the API over the course of several months. These accounts took steps to avoid detection and circumvent the technological measures in place to prevent mass downloads and access from unauthorized accounts, and to instead mask their usage as normal user behavior by slowly and methodically downloading content and metadata. The audio files that these accounts downloaded were encrypted and protected by DRM.

62.     On information and belief, Anna's Archive then took steps to decrypt the audio files and circumvent Spotify's DRM measures, so that the files could be reproduced and distributed outside of the Spotify platform.  Each time an account accessed Spotify to illegally "scrape" metadata and music files, steps were taken by Anna's Archive to circumvent the technological measures that Spotify uses to protect the copyrighted content.  Each account used by Anna's Archive, like all other Spotify user accounts, was required to accept the Spotify Terms before they could access the API.  Each account violated the Spotify Terms by scraping Spotify and taking steps to circumvent the technological measures Spotify uses to protect content.

63.     In its blog post, Anna's Archive announced that it had "backed up," *i.e.*, illegally reproduced and downloaded, a massive volume of "metadata and music files" from Spotify: approximately "86 million songs," which are "a little under 300 TB in total size."[18]  According to Anna's Archive, the music files it has downloaded purportedly contain the most popular music on Spotify and represent "99.6% of listens," even though they are only "37% of songs" available on Spotify.[19]

64.     Anna's Archive has stated that it intends to distribute the music files it scraped from Spotify in "bulk torrents" which will be "grouped by popularity."[20]  The website's "Torrents" page currently includes links to three torrents, which purportedly include cover art (including cover art owned by the Record Company Plaintiffs), metadata, and audio analysis that Anna's Archive scraped from Spotify.[21]  Anna's Archive has threatened to release the remaining data and files in "stages on our Torrents page."  This includes "music files," which will be

---

[18] Ex. D.
[19] *Id.*
[20] *Id.*
[21] *Torrents*, ANNA'S ARCHIVE, https://annas-archive.org/torrents/ (last visited December 28, 2025).

"release[ed] in order of popularity."[22]  Anna's Archive states:

> The data will be released in different stages on our Torrents page:
> - [X] Metadata (Dec 2025)
> - [ ] Music files (releasing in order of popularity)
> - [ ] Additional file metadata (torrent paths and checksums)
> - [ ] Album art
> - [ ] .zstdpatch files (to reconstruct original files before we added embedded metadata)

65.     The music files Anna's Archive claims to have scraped include, according to Anna's Archive, the 10,000 most popular sound recording on Spotify.  These sound recordings are listed in an HTML file linked in the December 20, 2025 blog post.[23]  The Copyrighted Sound Recordings at issue, as reflected in Exhibit A, appear on this list of 10,000 most popular sound recordings.  The sound recordings Anna's Archive has illegally downloaded and promised to release range from iconic classics like U2's "Sunday Bloody Sunday" and The B-52's "Love Shack," to more recent hits by leading artists such as Bruno Mars, Cardi B, Beyoncé, Meghan Trainor, Halsey, and Lady Gaga.

66.     In other words, Anna's Archive has promised to illegally distribute *millions* of the most popular sound recordings in the world via BitTorrent to anyone who has an Internet connection and enough space to download them.

67.     Anna's Archive has also threatened to "add downloading of individual [audio] files." Ex. D.  This would allow users to search for and download essentially any popular sound recording, without authorization or compensation to copyright holders.  Anna's Archive is effectively attempting to create a pirate version of Spotify and to deprive copyright owners and their licensees of the value of the copyrighted works.

---

[22] Ex. D.
[23] *Top 10,000 Songs by Popularity*, https://annas-archive.org/blog/spotify/spotify-top-10k-songs-table.html (last visited December 28, 2025).

68.     Anna's Archive's actions are flagrantly illegal.  It is attempting to replace streams on Spotify or streams or downloads on other services (which results in compensation to artists, songwriters, and copyright owners for exploitation of the sound recordings at issue) with visits to and illegal downloads from its own website for Anna's Archive's own profit.  The real motivation for this existing and ongoing illegal activity (and the announcements around it) seems to be to generate publicity and revenue for Anna's Archive, which closes its blog post with a plea to pay them, rather than copyright owners and artists whose rights respecting the 86 million stolen sound recordings have been trampled: "Donate to Anna's Archive.  Any amount helps!" Ex. D.

## FIRST CLAIM FOR RELIEF
### (Direct Copyright Infringement)
### (By the Record Company Plaintiffs Against Defendants)

69.     The Record Company Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 68 as if fully set forth herein.

70.     Defendants have reproduced, and have threatened and promised to imminently distribute, unauthorized copies of the Record Company Plaintiffs' copyrighted works, including without limitation, the Copyrighted Sound Recordings listed in Exhibit A hereto.

71.     Defendants did not obtain permission or consent from the Record Company Plaintiffs to reproduce or distribute their copyrighted works, including without limitation, the Copyrighted Sound Recordings listed in Exhibit A hereto.

72.     The reproduction and distribution of the Record Company Plaintiffs' copyrighted works, including without limitation, the Copyrighted Sound Recordings listed in Exhibit A hereto, constitutes infringements of the Record Company Plaintiffs' registered copyrights and their exclusive rights under 17 U.S.C. § 106(1) and (3).

73.    Each infringing reproduction or distribution of the Copyrighted Sound Recordings or the Record Company Plaintiffs' other copyrighted works constitutes a separate and distinct act of copyright infringement.

74.    Defendants have willfully, intentionally, and purposefully infringed the copyrights at issue, and acted with reckless disregard for, and willful blindness to, the Record Company Plaintiffs' rights in the Copyrighted Sound Recordings and other copyrighted works. Defendants' willful infringement is evidenced by, among other things, Anna's Archive's stated admissions that it "deliberately" violates the copyright laws of many countries, its stated "goal" to make copyrighted material available to anyone, and its knowledge of the Spotify Terms that prohibit scraping of Spotify's music files.

75.    Given the enormous magnitude of Defendants' illegal reproduction and intended mass distribution of the Record Company Plaintiffs' sound recordings, the extent of the Record Company Plaintiffs' losses arising from Defendants' illegal conduct is extraordinary. The Record Company Plaintiffs have suffered damages as a direct and proximate result of infringement by Defendants of their copyrights and exclusive rights. The Record Company Plaintiffs are entitled to statutory damages in the amount of up to $150,000 for each work infringed pursuant to 17 U.S.C. § 504(c). In the alternative, the Record Company Plaintiffs are entitled to recover their actual damages, including any profits by Defendants attributable to the infringement, in an amount to be proven at trial pursuant to 17 U.S.C. § 504(b).

76.    The Record Company Plaintiffs should also be awarded their costs and reasonable attorneys' fees as the prevailing party pursuant to 17 U.S.C. § 505.

77.    Defendants' infringement has caused, and continues to cause, irreparable injury to the Record Company Plaintiffs for which there is no adequate remedy at law. The Record

Company Plaintiffs are thus also entitled to preliminary and permanent injunctive relief

prohibiting infringement of their copyrights and exclusive rights pursuant to 17 U.S.C. § 502.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract)**
**(By Spotify Against Defendants)**

78.     Spotify repeats and realleges every allegation contained in paragraphs 1 through

77 as if fully set forth herein.

79.     On information and belief, Defendants accessed Spotify's platform using

registered Spotify accounts, which required acceptance of Spotify's terms and conditions,

including the Spotify Terms.

80.     The Spotify Terms are valid and binding contracts between Spotify and its

registered users, *i.e.*, Defendants.

81.     Spotify has fully performed its obligations under the Spotify Terms.

Defendants have breached the Spotify Terms by: (a) "copying, reproducing, redistributing,

'ripping,' [and] transferring" audio files from Spotify (Ex. C ¶ 2); (b) "importing" and "copying"

local audio files from Spotify (*id.* ¶ 3); (c) transferring copies of cached Content" onto

unauthorized devices (*id.* ¶ 4); (d) "'crawling' or 'scraping'" Spotify (*id.* ¶ 5); and (e)

"circumventing" technological measures (*id.* ¶ 9).

82.     Spotify has suffered damages as a direct and proximate result of the breach of the

Spotify Terms by Defendants, in an amount to be proven at trial.

83.     Spotify has suffered and continues to suffer irreparable injury as a result of

Defendants' breach of the Spotify Terms, for which there is no adequate remedy at law.  Spotify

is thus entitled to injunctive relief enjoining Defendants from continuing to breach the Spotify

Terms.

### THIRD CLAIM FOR RELIEF
**(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**
**(By Spotify Against Defendants)**

84.     Spotify repeats and realleges every allegation contained in paragraphs 1 through 83 as if fully set forth herein.

85.     Spotify's computers are used in or affect interstate or foreign commerce and communication and are therefore protected computers pursuant to 18 U.S.C. § 1030(e)(2).

86.     On information and belief, Defendants not only violated the Spotify Terms, but also intentionally circumvented technological measures to prevent automated extraction of music files and related metadata.

87.     Defendants obtained valuable information from Spotify's protected computers, including the Copyrighted Sound Recordings, other audio files, and related metadata.

88.     Defendants knowingly, willfully, and with intent to defraud accessed Spotify's protected computers without authorization or in excess of authorization.

89.     By accessing Spotify's protected computers, Defendants furthered the intended fraud and, on information and belief, thereby obtained valuable information and increased revenue.

90.     Defendants intentionally accessed Spotify's protected computers without authorization, and as a result of such conduct, caused damage and loss to Plaintiffs.

91.     The conduct by Defendants described above has caused a loss to Spotify during a one-year period of more than $5,000.

92.     Spotify has been damaged by the conduct of Defendants described above, including by incurring the cost of investigating and remedying the unauthorized access of its protected computers and preventing future unauthorized access by Defendants.

93.     Spotify has suffered irreparable harm resulting from the conduct of Defendants described above for which there is no adequate remedy at law and which will continue unless Defendants are enjoined from unauthorized access of Spotify's protected computers.  Spotify is entitled to injunctive relief pursuant to 18 U.S.C. § 1030(g).

### FOURTH CLAIM FOR RELIEF
### (Violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201)
### (By All Plaintiffs Against Defendants)

94.     Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 93 as if fully set forth herein.

95.     The audio files available for streaming and download on Spotify include the Copyrighted Sound Recordings and other works protected by copyright.

96.     Spotify employs technological measures that effectively control access to protected works, including by preventing unauthorized accounts from accessing Spotify's services, by preventing automated downloading or scraping of audio files and metadata, and by applying encryption and DRM technology to audio files.

97.     Defendants have intentionally circumvented technological measures that effectively control access to protected works, including by using thousands of accounts to mask its usage as ordinary user behavior and by decrypting encrypted audio files and removing DRM.

98.     Plaintiffs have suffered irreparable harm resulting from the conduct of Defendants described above for which there is no adequate remedy at law and which will continue unless Defendants are enjoined from circumventing Spotify's technological measures.  Plaintiffs are entitled to injunctive relief pursuant to 17 U.S.C. § 1203(b)(1).

99.     Plaintiffs are also entitled to an award of statutory damages of $2,500 per act of circumvention pursuant to 17 U.S.C. § 1203(c)(3), or in the alternative, actual damages,

including profits by Defendants, pursuant to 17 U.S.C. § 1203(c)(2).

100.    Plaintiffs are also entitled to an award of costs and reasonable attorneys' fees in this action pursuant to 17 U.S.C. § 1203(b)(4) and (5).

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for judgment from this Court in Plaintiffs' favor and against Defendants, and grant the following relief:

A.    Enter a temporary restraining order and preliminary and permanent injunction: (1) requiring that Defendants and their respective officers, agents, servants, employees, attorneys, and others in active concert or participation with each or any of them, cease infringing, or causing, enabling, facilitating, encouraging, promoting, inducing, and/or participating in the infringement of, any of the Record Company Plaintiffs' copyrights protected by the Copyright Act, whether now in existence or hereafter created, including without limitation the Copyrighted Sound Recordings; and (2) directing third-party Internet registries, domain name registrars, data centers, and hosting and service providers to refrain from frustrating, and to reasonably assist in the implementation of, the relief described above, including without limitation by ceasing any hosting services for the websites located at annas-archive.org, annas-archive.li, or annas-archive.se or any other websites that host the infringing content or directly facilitate its distribution; by disabling the annas-archive.org domain name and making it inactive and untransferable; and by disabling the authoritative nameservers for the annas-archive.li and annas-archive.se websites and making them inactive and untransferable.

B.    Enter judgment awarding the Record Company Plaintiffs statutory damages pursuant to 17 U.S.C. § 504(c), up to the maximum amount of $150,000 per infringed work, or such other amounts as may be proper under 17 U.S.C. § 504(c), or, in the alternative, at the

Record Company Plaintiffs' election pursuant to 17 U.S.C. § 504(b), the Record Company Plaintiffs' actual damages and Defendants' profits from infringement, in amounts to be proven at trial.

C.    Enter a permanent injunction enjoining and restraining Defendants and their respective officers, agents, servants, employees, attorneys, and others in active concert or participation with each or any of them, from (1) breaching the Spotify Terms; (2) accessing Spotify's protected computers without authorization or in excess of authorization; and (3) circumventing technological measures that effectively control access to protected works on Spotify.

D.    Enter an order requiring Defendants to return or destroy all copies of all files, data and metadata scraped or otherwise obtained from Spotify and certifying that they have done so.

E.    Enter judgment awarding Spotify damages as a direct and proximate result of the breach of the Spotify Terms by Defendants, and costs incurred investigating and remedying the unauthorized access of its protected computers and preventing future unauthorized access by Defendants, in an amount to be proven at trial.

F.    Enter judgment awarding Plaintiffs statutory damages of $2,500 per act of circumvention pursuant to 17 U.S.C. § 1203(c)(3), or in the alternative, actual damages, including profits by Defendants, pursuant to 17 U.S.C. § 1203(c)(2).

G.    For Plaintiffs' costs and reasonable attorneys' fees, including pursuant to 17 U.S.C. § 1203(b)(4) and (5).

H.    For pre- and post-judgment interest as permitted by law.

I.    For such other relief as the Court may deem just and proper.

Dated: December 29, 2025                    Respectfully submitted,


                                            */s/ Randi W. Singer*
                                            Rollin A. Ransom (*pro hac vice forthcoming*)
                                            Lauren M. De Lilly (*pro hac vice forthcoming*)
                                            SIDLEY AUSTIN LLP
                                            350 South Grand Street
                                            Los Angeles, CA 90071
                                            Telephone: (213) 896-6000
                                            Facsimile: (213) 896-6600
                                            Email: rransom@sidley.com
                                            Email: ldelilly@sidley.com

                                            Randi W. Singer (SBN 2946671)
                                            SIDLEY AUSTIN LLP
                                            787 Seventh Avenue
                                            New York, NY 10019
                                            Telephone: (212) 839-5300
                                            Facsimile: (212) 839-5599
                                            Email: randi.singer@sidley.com

                                            *Attorneys for Plaintiffs*

## <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury of all issues so triable in this action.

Dated: December 29, 2025

Respectfully submitted,

*/s/ Randi W. Singer*
Rollin A. Ransom (*pro hac vice forthcoming*)
Lauren M. De Lilly (*pro hac vice forthcoming*)
SIDLEY AUSTIN LLP
350 South Grand Street
Los Angeles, CA 90071
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
Email: rransom@sidley.com
Email: ldelilly@sidley.com

Randi W. Singer (SBN 2946671)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: randi.singer@sidley.com

*Attorneys for Plaintiffs*