**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ATLANTIC RECORDING CORPORATION; ATLANTIC MUSIC GROUP LLC; BAD BOY RECORDS LLC; ELEKTRA ENTERTAINMENT LLC; ELEKTRA ENTERTAINMENT GROUP INC.; FUELED BY RAMEN LLC; WARNER MUSIC INTERNATIONAL SERVICES LIMITED; WARNER RECORDS INC.; WARNER RECORDS LLC; SONY MUSIC ENTERTAINMENT; ARISTA MUSIC; ARISTA RECORDS, LLC; ZOMBA RECORDING LLC; UMG RECORDINGS, INC.; CAPITOL RECORDS, LLC; and SPOTIFY USA INC., <br><br> Plaintiffs, <br><br> v. <br><br> ANNA'S ARCHIVE and DOES 1-10, <br><br> Defendants. | No. _____ <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AN EMERGENCY *EX PARTE* TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** <br><br> **[FILED UNDER SEAL]** |

# TABLE OF CONTENTS

**Page No.**

**PRELIMINARY STATEMENT** ...................................................................................1

**FACTUAL BACKGROUND** ....................................................................................3

I.      Anna's Archive Threatens to Release 86 Million Copyrighted Music Files That It Illegally "Scraped" from Spotify. ..............................................................................3

II.     Anna's Archive Relies on Service Providers In the United States to Reach Its Users. .......5

III.    The Record Company Plaintiffs Would Suffer Extraordinary and Irreparable Harm from the Mass Distribution of the Copyrighted Sound Recordings. ............................................6

**ARGUMENT** ..............................................................................................................7

I.      The Court Should Issue a Temporary Restraining Order Prohibiting the Further Reproduction and Any Distribution of the Illegally Downloaded Files. ............................8

    A.    Legal Standard. ..................................................................................................8

    B.    The Record Company Plaintiffs Are Likely to Succeed on the Merits of Their Direct Copyright Infringement Claim. ................................................................8

    C.    The Record Company Plaintiffs Would Be Irreparably Harmed by the Illegal, Widespread Distribution of Their Copyrighted Sound Recordings. ....................11

    D.    The Balance of the Equities Strongly Favors Legal Copyright Holders Like the Record Company Plaintiffs Over Willful Infringers. ............................................14

    E.    The Public Interest Strongly Favors Enforcement of the Law and the Record Company Plaintiffs' Rights. ...............................................................................14

II.     The Court Is Authorized to Direct Cooperation by Third Parties, Including Domain Registrars and Web Hosting Providers. ..............................................................................15

III.    The Temporary Restraining Order Must Be Ex Parte. .....................................................20

IV.   The Record Company Plaintiffs' Request for a Security Bond in the Amount of $5,000 Is Adequate. ............................................................................................................................23

V.     The Court Should Authorize Plaintiffs to Serve Process by Email. ..................................23

**CONCLUSION** ..........................................................................................................26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABS-CBN Int'l v. Freepinoychannel.com*,
  No. 15-61002-civ-Dimitrouleas/Snow, 2015 WL 11069997 (S.D. Fla. May 15, 2015) ...21, 22

*Advanced Access Content Sys. Licensing Adm'r, LLC v. Shen*,
  No. 14-cv-1112 (VSB), slip op. (S.D.N.Y. Mar. 4, 2014) (Dkt. No. 21) ..............................16

*In re Apple, Inc.*,
  149 F. Supp. 3d 341 (E.D.N.Y. 2016) ...................................................................................17

*In re Application of United States for an Order Authorizing an In-Progress Trace of Wire*,
  616 F.2d 1122 (9th Cir. 1980) ..............................................................................................19

*Arista Recs., LLC v. Tkach*,
  122 F. Supp. 3d 32 (S.D.N.Y. 2015)................................................................................16, 22

*Arista Recs. LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009).....................................................................................9

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
  510 F. Supp. 3d 108 (S.D.N.Y. 2020)....................................................................................11

*AT&T Broadband v. Tech Commc'ns, Inc.*,
  381 F.3d 1309 (11th Cir. 2004) .............................................................................................22

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*,
  770 F.2d 328 (2d Cir. 1985).....................................................................................................17

*Capitol Recs., LLC v. ReDigi Inc.*,
  934 F. Supp. 2d 640 (S.D.N.Y. 2013), *aff'd*, 910 F.3d 649 (2d Cir. 2018) ...........................10

*Cengage Learning v. Doe 1*,
  Case No. 18-cv-403 (RJS), 2018 WL 2244461 (S.D.N.Y. Jan. 17, 2018) .............................25

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010)..........................................................................................8, 9, 11

*CJ Prods. LLC v. Snuggly Plushez LLC*,
  809 F. Supp. 2d 127 (E.D.N.Y. 2011) ...................................................................................14

*Datatech Enters., LLC v. FF Magnat Ltd*,
  No. 12-cv-4500 (CRB), slip op. (N.D. Cal. Aug. 28, 2012) (Dkt. No. 9) .............................21

*Doctor's Assocs., Inc. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996)...................................................................................23

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003)........................................................................................15

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Loc. No. 70*,
    415 U.S. 423 (1974).................................................................................21, 23

*Hydentra Hlp Int. Ltd. v. Porn69.org*,
    No. CV15-00451-PHX DGC, 2015 WL 8064770 (D. Ariz. Dec. 7, 2015)...........................25

*Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*,
    965 F.2d 1224 (2d Cir. 1992)...................................................................................8

*Makekau v. State*,
    943 F.3d 1200 (9th Cir. 2019) ...............................................................................17

*Microsoft Corp. v. Does 1-2*,
    No. 20 Civ. 1217 (LDH) (RER), 2021 WL 4260665 (E.D.N.Y. Sept. 20, 2021) .............16, 19

*Microsoft Corp. v. Tu*,
    No. 23 Civ. 10685 (PAE), 2024 WL 4516416 (S.D.N.Y. Aug. 29, 2024)......................16, 19

*N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. LTD. Co.*,
    No. 10 Civ. 1630 (AKH), 2011 WL 12908845 (S.D.N.Y. June 24, 2011) .............................16

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
    16 N.Y.3d 295 (2011) ........................................................................................11

*Philip Morris USA Inc. v. Veles Ltd.*,
    No. 06 CV 2988 (GBD), 2007 WL 725412 (S.D.N.Y. Mar. 12, 2007).................................25

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,
    970 F.2d 552 (9th Cir. 1992) ...............................................................................21

*Richemont Int'l SA v. Long*,
    No. 13-CV-9071, 2014 WL 12543815 (S.D.N.Y. July 11, 2014) .........................................16

*Rio Props., Inc. v. Rio Int'l Interlink*,
    284 F.3d 1007 (9th Cir. 2002) ........................................................................24, 25

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).....................................................................................12

*Shutterfly, Inc. v. ForeverArts, Inc.*,
    No. CR 12-3671 (ST), 2012 WL 2911887 (N.D. Cal. July 13, 2012)....................................21

*Sony Music Ent. Inc. v. Does 1-40*,
    326 F. Supp. 2d 556 (S.D.N.Y. 2004) ................................................................................10

*Sprint Spectrum L.P. v. Mills*,
    283 F.3d 404 (2d Cir. 2002) ................................................................................................17

*Strike 3 Holdings, LLC v. Doe*,
    No. 22-CV-1618 (LJL), 2022 WL 785216 (S.D.N.Y. Mar. 15, 2022) ...................................10

*Strougo v. Barclays PLC*,
    194 F. Supp. 3d 230 (S.D.N.Y. 2016) ....................................................................................8

*Take-Two Interactive Software, Inc. v. Zipperer*,
    No. 18 Civ. 2608 (LLS), 2018 WL 4347796 (S.D.N.Y. Aug. 16, 2018) ..............................13

*Tangle, Inc. v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated Ass'ns
    Identified on Schedule A*,
    Case No. 1:22-cv-2350 (VEC), (S.D.N.Y. Mar. 23, 2022) (Dkt. No. 18) .............................21

*Tangle, Inc. v. Individuals, Corps., Ltd. Liab. Cos., Partnerships, & Unincorporated
    Assocs. Identified on Schedule A Hereto*,
    No. 1:22-CV-02350, 2022 WL 1125278 (S.D.N.Y. Apr. 14, 2022) ................................16, 23

*True Religion Apparel, Inc. v. Xiaokang Lei*,
    No. 11-cv-8242 (HB), slip op. (S.D.N.Y. Nov. 17, 2011) (Dkt. No. 7) ..........................16, 21

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*,
    523 F. Supp. 2d 328 (S.D.N.Y. 2007) ..................................................................................18

*U2 Home Entm't, Inc. v. Bowery Music City, Inc.*,
    No. 03 Civ. 8909 (RJH), 2003 WL 22889738 (S.D.N.Y. Dec. 8, 2003) ..............................21

*United Spinal Ass'n v. Bd. of Elections in City of N.Y.*,
    No. 10 Civ. 5653 (DAB) (HBP), 2017 WL 8683672 (S.D.N.Y. Oct. 11, 2017) ...................18

*United States v. Amante*,
    418 F.3d 220 (2d Cir. 2005) ................................................................................................17

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977) ....................................................................................17, 18, 19, 20

*In re Vuitton et Fils S.A.*,
    606 F.2d 1 (2d Cir. 1979) (per curiam) ......................................................................20, 21, 22

*Warner Bros. Ent. Inc. v. Doe*,
    No. 14-CV-3492 (KPF), 2014 WL 12543818 (S.D.N.Y. May 29, 2014) ..............................16

*Warner Bros. Ent. Inc. v. RDR Books*,
 575 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) .................................................................................................8

*XYZ Corp. v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated Ass'ns Identified on Schedule A*,
 No. 24-CV-4428 (LLS), 2024 WL 3718106 (S.D.N.Y. Aug. 6, 2024) .................21

*Yonkers Racing Corp. v. City of Yonkers*,
 858 F.2d 855 (2d Cir. 1988) ...............................................................................17

*Yurman Design, Inc. v. PAJ, Inc.*,
 262 F.3d 101 (2d Cir. 2001) .................................................................................8

**Statutes and Court Rules**

17 U.S.C. § 106 ..........................................................................................................9, 10

17 U.S.C. § 502 ..............................................................................................................17

28 U.S.C. § 1331 ............................................................................................................18

28 U.S.C. § 1651 ........................................................................................2, 16, 17, 18, 19

N.Y. C.P.L.R. § 302 .......................................................................................................11

Fed. R. Civ. P. 4 .......................................................................................................11, 24

Fed. R. Civ. P. 65 ...............................................................................................20, 21, 23

Plaintiffs Atlantic Recording Corporation, Atlantic Music Group LLC, Bad Boy Records LLC, Elektra Entertainment Group Inc., Elektra Entertainment LLC, Fueled by Ramen LLC, Warner Music International Services Limited, Warner Records Inc., Warner Records LLC, Sony Music Entertainment, Arista Music, Arista Records, LLC, Zomba Recording LLC, UMG Recordings, Inc., and Capitol Records, LLC (collectively, the "Record Company Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Emergency *Ex Parte* Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction, and for related relief.

## PRELIMINARY STATEMENT

This action involves the massive infringement of millions of the world's most valuable sound recordings. Defendant Anna's Archive ("Defendant" or "Anna's Archive") operates a group of decentralized, anonymous piracy websites. On Saturday, December 20, 2025, Anna's Archive announced that it had "scraped" (*i.e.*, illegally copied) 86 million sound recordings from the popular streaming platform Spotify—including many owned by the Record Company Plaintiffs—and that it intended to release those sound recordings to the public imminently. Plaintiffs promptly filed this action on December 29, 2025, the first court day after Christmas.

Anna's Archive has admitted that it routinely violates copyright law and has made no effort to conceal its infringement of the Record Company Plaintiffs' copyrights in this case. The individuals who operate Anna's Archive believe that they can ignore the law by remaining anonymous, accepting payments from users in cryptocurrency, and using foreign domain registrars and web hosting services that turn a blind eye to copyright infringement. However, Anna's Archive relies on at least two U.S.-based service providers: the Public Interest Registry ("PIR") and Cloudflare, Inc. ("Cloudflare"). Together, PIR and Cloudflare have the power to

shut off access to the three web domains that Anna's Archive uses to unlawfully distribute copyrighted works.

The Court should issue a temporary restraining order requiring that Anna's Archive immediately cease and desist from all reproduction or distribution of the Record Company Plaintiffs' copyrighted works and should exercise its power under the All Writs Act to direct PIR and Cloudflare to facilitate enforcement of that order.

Moreover, if Anna's Archive receives notice that the Record Company Plaintiffs are seeking this temporary restraining order, it will almost certainly release the sound recordings that it has illegally copied from Spotify to the public immediately and activate contingency plans to relocate its infrastructure outside of the United States. To prevent this, Plaintiffs have filed their Complaint under seal, and the Record Company Plaintiffs now ask the Court to issue its temporary restraining order on an *ex parte* basis, so that Anna's Archive cannot pre-emptively frustrate the very relief sought by the Record Company Plaintiffs' motion.

Finally, because Anna's Archive operates anonymously, Plaintiffs also ask the Court to grant leave to serve Anna's Archive by email, which is the only available method of contact. The websites Anna's Archive uses are either completely anonymous, or in one instance, registered to what appears to be a bogus company with a dubious address in Liberia, which is not a party to the Hague Convention governing service. Thus, Anna's Archive should receive notice by email, but only ***after*** a temporary restraining order is issued by the Court and implemented by PIR and Cloudflare, to prevent Anna's Archive from following through with its plan to release millions of illegally obtained, copyrighted sound recordings to the public.

## FACTUAL BACKGROUND

I.    **Anna's Archive Threatens to Release 86 Million Copyrighted Music Files That It Illegally "Scraped" from Spotify.**

The Record Company Plaintiffs are engaged in the creation, distribution, marketing, licensing, and sale of sound recordings. Declaration of Brad Cohen ("Cohen Decl.") ¶ 3; Declaration of David Jacoby ("Jacoby Decl.") ¶ 3; Declaration of Alasdair McMullan ("McMullan Decl.) ¶ 3. They own the copyrights or have exclusive rights (*e.g.*, reproduction and/or distribution rights) in the sound recordings listed in Exhibit A to the Complaint in this action (the "Copyrighted Sound Recordings"), and have registered these copyrights with the United States Copyright Office. Compl. ¶¶ 24-25, Ex. A; Cohen Decl. ¶ 4, Ex. A; Jacoby Decl. ¶ 4, Ex. A; McMullan Decl. ¶ 4, Ex. A.

Spotify is a popular music streaming service to which the Record Company Plaintiffs license their catalogs of sound recordings, including the Copyrighted Sound Recordings. Compl. ¶¶ 46-48. Spotify's users can stream the Copyrighted Sound Recordings and other content by creating an account on Spotify; Spotify then earns revenue through advertisements and through paid Premium subscriptions, which provide Spotify users with additional features and functionality, such as storing music for offline listening. *Id.* ¶¶ 47-49, 52. Spotify implements a variety of technological measures to protect copyrighted works and prevent users from accessing, reproducing, digitally transmitting, or distributing the copyrighted works without authorization. In particular, Spotify applies encryption and other digital rights management ("DRM") protection to control access to protected works. *Id.* ¶ 54.

On December 20, 2025, an online pirate library that refers to itself as "Anna's Archive" (and that is formerly known as the "Pirate Library Mirror") announced in a public blog post that it had "discovered a way to scrape Spotify at scale," and that it had illegally downloaded from

Spotify "around 86 million music files, representing around 99.6% of listens" on Spotify's platform, together with album cover art and metadata associated with those music files. Declaration of Mark McDevitt ("McDevitt Decl."), Ex A at 2. Anna's Archive also posted a list of "the top 10,000 most popular songs" that it claims to have downloaded from Spotify, *id.*, which includes all the Copyrighted Sound Recordings. Compl. ¶ 65, Ex. A; Cohen Decl. ¶ 4, Ex. A; Jacoby Decl. ¶ 4, Ex. A; McMullan Decl. ¶ 4, Ex. A; McDevitt Decl. Ex. B. This "scraping" process constituted a direct violation of the Spotify Terms of Use and User Guidelines (together, the "Spotify Terms") to which Anna's Archive agreed in accessing the Spotify platform; among other things, the Spotify Terms expressly prohibit copying, reproducing, "ripping," transferring, or "scraping" any content on the platform. Compl. ¶¶ 52-56. The Spotify Terms also prohibit circumvention of the DRM and other technological protection measures used by Spotify to protect copyrighted content. *Id.* To accomplish its mass unlawful scraping, Anna's Archive circumvented Spotify's technological protection measures and violated that prohibition as well. Compl. ¶¶ 58-62; McDevitt Decl. ¶ 10.

Anna's Archive also announced that it would imminently release "torrent" files for the "music files" it had scraped, releasing them "in order of popularity." McDevitt Decl. Ex A at 2. A "torrent" file enables users to download a file or files from other users on BitTorrent, a peer-to-peer file-sharing network that is overwhelmingly used for the infringing reproduction and distribution of copyrighted material. McDevitt Decl. ¶¶ 4-5. If Anna's Archive were to post torrent files for the sound recordings it claims to have scraped (*i.e.*, illegally copied) from Spotify, it would enable anyone with an internet connection to download those recordings for free through the BitTorrent network. *Id.* ¶¶ 14-15. And Anna's Archive has already made good on its threat to release and distribute other content that it scraped from Spotify. First, on

December 20, 2025, Anna's Archive posted a torrent file to its website that enabled the downloading of some of the metadata it scraped from Spotify. Then, on December 22, 2025, Anna's Archive posted a torrent file that enabled the downloading of album cover art, including album cover art for which the copyrights are owned or exclusively controlled by the Record Company Plaintiffs. *Id.* ¶¶12-13.

## II.    Anna's Archive Relies on Service Providers In the United States to Reach Its Users.

The operators of Anna's Archive readily admit that they "deliberately violate the copyright law in most countries." Declaration of Rollin A. Ransom ("Ransom Decl."), Ex. G at 1. They also recognize that they "need to stay anonymous" because they could otherwise face serious legal consequences, including "decades of prison time." *Id.*, Ex. H at 2; McDevitt Decl., Ex. C at 2. Anna's Archive thus solicits donations in untraceable formats like cryptocurrency and gift cards in exchange for faster downloads because it does not have access to traditional financial institutions. *Id.*; Ransom Decl., Ex. D at 1-2.

Anna's Archive currently operates three principal websites offering the torrent files referenced above: annas-archive.org; annas-archive.li; and annas-archive.se. McDevitt Decl. ¶ 17. The registration associated with the annas-archive.org domain name does not include any publicly available information as to the registrant of that domain name; instead, Anna's Archive uses a "masking" service to hide its identity from the public. *Id.* ¶ 18. However, the ".org" top-level domain is controlled by PIR, based in Reston, Virginia. *Id.* PIR has the technical capability to implement a "lock" on the annas-archive.org domain name that would prevent users from accessing the annas-archive.org domain during the pendency of this action. *Id*. ¶ 22.

The ".li" and ".se" domains are reserved for the countries of Liechtenstein and Sweden (though a registrant need not have any association with those countries to use those domains). *Id.* As with the annas-archive.org domain name, the registration associated with the annas-archive.li

domain name provides no registrant information. While the registration associated with the annas-archive.se domain name provides a company name, "Cyberdyne S.A.," both that name and the corresponding address in Monrovia, Liberia are of dubious authenticity. *Id.* Moreover, the websites associated with Anna's Archive do not have "contact us" pages that provide any contact information that can be attributed to a real person, but only provide two anonymous email addresses, annadmca@proton.me and ArchivistAnna3+7oBz9nJ+nt@proton.me. *Id.* ¶ 28.

Although the domain name registrars for the annas-archive.li and annas-archive.se domains are located outside of the United States, Anna's Archive relies on Cloudflare, headquartered in San Francisco, California, to provide a so-called "reverse proxy service" for the sites. Cloudflare effectively acts as a "middleman" between the websites and users who wish to access them, providing the information necessary for a user's computer to convert the domain names into the numerical Internet Protocol address of the server hosting the website. *Id.* ¶¶ 19, 23. These "authoritative nameservers" are necessary for users to connect to Anna's Archive using the annas-archive.li and annas-archive.se domains, and Cloudflare has the technical capability to disable the authoritative nameservers, which would prevent users from accessing these websites. *Id.* ¶ 23.

### III. The Record Company Plaintiffs Would Suffer Extraordinary and Irreparable Harm from the Mass Distribution of the Copyrighted Sound Recordings.

The Record Company Plaintiffs' business model relies in significant part on the licensing of their catalogs of sound recordings to legitimate streaming services like Spotify. Cohen Decl. ¶ 6; Jacoby Decl. ¶ 6; McMullan Decl. ¶ 6. If consumers can instead download the Record Company Plaintiffs' catalogs of sound recordings for free and without restriction via the BitTorrent network or other means, they will have little incentive to pay for legitimate streaming services. *Id.* Unauthorized distribution would also materially limit and interfere with the Record

Company Plaintiffs' right and ability to charge a fair market rate for their sound recordings to licensees like Spotify, who rely on Record Company Plaintiffs to control distribution so that they can earn revenue from licensed works. Cohen Decl. ¶ 7; Jacoby Decl. ¶ 7; McMullan Decl. ¶ 7.

Given the enormous magnitude of Anna's Archive's illegal scraping of sound recordings from Spotify, the Record Company Plaintiffs' losses would be extraordinary and incalculable if Anna's Archive were to make good on its pledge to release and mass distribute those sound recordings on the BitTorrent network. Cohen Decl. ¶ 8; Jacoby Decl. ¶ 8; McMullan Decl. ¶ 8. Absent relief from the Court, the Record Company Plaintiffs will suffer irreparable harm that no damages award can mitigate. *Id.*

## **ARGUMENT**

A temporary restraining order is warranted because (1) the Record Company Plaintiffs are likely to succeed on the merits of their direct copyright infringement claim, (2) Defendant's conduct has caused, and is continuing to cause, irreparable harm to the Record Company Plaintiffs, (3) the balance of equities tips plainly in the Record Company Plaintiffs' favor, and (4) issuing a temporary restraining order is in the public interest, including to prevent further massive copyright infringement by Defendant. Furthermore, the relief sought by the Record Company Plaintiffs must occur *ex parte* because if Defendant is notified that this action has been filed or of the requested relief, there is a strong likelihood that Defendant will accelerate its threatened mass distribution of the Record Company Plaintiffs' copyrighted sound recordings, immediately releasing the *millions* of music files that it illegally scraped from Spotify to the public through the BitTorrent network. There is also a strong likelihood that Defendant would quickly change service providers, including to wholly distance its operations from the United States, in a further effort to interfere with Plaintiffs' protection and enforcement of their rights.

I.     **The Court Should Issue a Temporary Restraining Order Prohibiting the Further Reproduction and Any Distribution of the Illegally Downloaded Files.**

A.     **Legal Standard.**

A plaintiff is entitled to a temporary restraining order or preliminary injunction when (1) the plaintiff "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities" favors the plaintiff," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010); *see also Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992) (explaining that temporary restraining orders are governed by the same standards as preliminary injunctions).

Courts take a "sliding scale" approach to the temporary restraining order factors, such that "more of one excuses less of the other." *Strougo v. Barclays PLC*, 194 F. Supp. 3d 230, 233 (S.D.N.Y. 2016) (cleaned up). In this Circuit, a temporary restraining order may be granted where there is "irreparable harm" and "sufficiently serious questions going to the merits." *Citigroup*, 598 F.3d 30, 35 (cleaned up). This "flexible" standard permits a court to issue a temporary restraining order "where the costs outweigh the benefits of not granting the injunction" even where (unlike the instant case) there is some "uncertainty" about the merits. *Id.* at 35, 39. Here, each factor weighs heavily in favor of entry of a temporary restraining order.

B.     **The Record Company Plaintiffs Are Likely to Succeed on the Merits of Their Direct Copyright Infringement Claim.**

The Record Company Plaintiffs are likely to prevail on their claim for direct copyright infringement against Anna's Archive. Compl. ¶¶ 69-77. To prove copyright infringement, the Record Company Plaintiffs need only demonstrate (1) "ownership of a valid copyright," and (2) "infringement of the copyright by" Defendant. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101,

109 (2d Cir. 2001). Even at this early stage, the Record Company Plaintiffs have offered evidence that decisively establishes both elements and have consequently shown that they are likely to succeed on the merits of their claim. *See Citigroup*, 598 F.3d 30, 34.

First, the Record Company Plaintiffs own copyrights or control exclusive U.S. rights under copyright in sound recordings available for streaming on Spotify, including the representative Copyrighted Sound Recordings listed in Exhibit A to the Complaint in this action, each of which has been registered with the United States Copyright Office. *See* Compl. ¶¶ 24-25; Cohen Decl. ¶ 4, Ex. A; Jacoby Decl. ¶ 4, Ex. A; McMullan Decl. ¶ 4, Ex. A.

Second, Anna's Archive has ***publicly admitted*** that it has infringed the Record Company Plaintiffs' copyrights in the Copyrighted Sound Recordings. In its December 20, 2025, blog post, Anna's Archive stated that it has "backed up Spotify" and "archived around 86 million music files." McDevitt Decl., ¶ 10, Ex. A at 2. In other words, Anna's Archive has, without authorization, reproduced many of Spotify's music files, including files containing sound recordings owned by the Record Company Plaintiffs. Anna's Archive has also stated that the 86 million files it illegally "scraped" from Spotify include the 10,000 most popular sound recordings on Spotify, which are listed in an HTML file linked in the blog post. *Id.*, Ex. B. All of the Copyrighted Sound Recordings are included in this list of 10,000 sound recordings that Anna's Archive has "backed up" and "archived." *See* Cohen Decl. ¶ 4, Ex. A; Jacoby Decl. ¶ 4, Ex. A; McMullan Decl. ¶ 4, Ex. A.

"Backing up" and "archiving" the Copyrighted Sound Recordings without authorization is flagrant infringement of the Record Company Plaintiffs' exclusive right of reproduction under 17 U.S.C. § 106(1). *See, e.g.*, *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 149 (S.D.N.Y. 2009) ("downloading copies of [copyrighted] works" and "creating copies of the

works on their computers without [copyright owners'] authorization" was a "direct infringement of [the copyright owners'] exclusive right of reproduction"). Anna's Archive has never been authorized by the Record Company Plaintiffs to reproduce or distribute any of their sound recordings, including without limitation the Copyrighted Sound Recordings. *See* Cohen Decl. ¶ 5, Ex. A; Jacoby Decl. ¶ 5, Ex. A; McMullan Decl. ¶ 5, Ex. A.

Anna's Archive has also promised to expand its infringement by distributing the 86 million music files it "backed up" from Spotify, including the Copyrighted Sound Recordings, through the BitTorrent network. McDevitt Decl., Ex. A at 1 (announcing that the "music files" will be "distributed in bulk torrents" on the Anna's Archive Torrents page, "in order of popularity"). BitTorrent is a peer-to-peer ("P2P") file sharing network, and distributing the unlawfully obtained music files via BitTorrent will involve "seeding" copies so they can be accessed by BitTorrent users and providing "torrent" files to allow users to download them. *See* McDevitt Decl. ¶¶ 4-5. This is a direct infringement of the Record Company Plaintiffs' exclusive rights of reproduction and distribution of the Copyrighted Sound Recordings under 17 U.S.C. § 106(1) and (3). *Sony Music Ent. Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 565–66 (S.D.N.Y. 2004) ("[T]he use of P2P systems to download and distribute copyrighted music has been held to constitute copyright infringement."); *Strike 3 Holdings, LLC v. Doe*, No. 22-CV-1618 (LJL), 2022 WL 785216, at *1 (S.D.N.Y. Mar. 15, 2022) ("[T]he distribution of copyrighted material through file sharing services qualifies as copyright infringement."); *Capitol Recs., LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 648 (S.D.N.Y. 2013) (holding "unauthorized transfer of a digital music file over the Internet . . . constitutes reproduction within the meaning of the Copyright Act"), *aff'd*, 910 F.3d 649 (2d Cir. 2018).

On this record, Anna's Archive has unquestionably infringed, and will continue to infringe, the Record Company Plaintiffs' copyrights by reproducing and distributing the Copyrighted Sound Recordings. The Record Company Plaintiffs have thus shown that they are likely to succeed on the merits of their direct copyright infringement claim against Anna's Archive, and this factor strongly favors the Record Company Plaintiffs' requested relief.[1]

### C.    The Record Company Plaintiffs Would Be Irreparably Harmed by the Illegal, Widespread Distribution of Their Copyrighted Sound Recordings.

The Record Company Plaintiffs have also shown that they have suffered, and are likely to continue suffering, serious and irreparable harm absent injunctive relief. As noted above, in addition to the harm caused by Anna's Archive's unlawful reproduction of the Copyrighted Sound Recordings when it "scraped" 86 million of Spotify's music files, Anna's Archive is also threatening to imminently, and illegally, distribute the Copyrighted Sound Recordings and countless other music files in which the Record Company Plaintiffs have rights. *See Citigroup*, 598 F.3d 30, 34. Moreover, there is no question that Anna's Archive can and will make good on this threat: it has already posted torrent files to its websites that enable the downloading of album

---

[1] The Court can properly exercise personal jurisdiction over Anna's Archive with respect to the Plaintiffs' claims in this action. Among other things, New York's long arm statute confers personal jurisdiction over foreign defendants who commit torts outside of New York that cause harm inside of New York. *See* N.Y. C.P.L.R. § 302(a)(3). Here, virtually all of the Plaintiffs have their principal places of business in New York, Compl. ¶¶ 5-20, and have decidedly suffered harm here. *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 302 (2011). Alternatively, the Court has personal jurisdiction over Anna's Archive pursuant to Federal Rule of Civil Procedure 4(k)(2), which "allows federal courts to exercise personal jurisdiction if (1) plaintiff's cause of action arises under the federal law; (2) the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one State; and (3) the defendant's total contacts with the United States as a whole are sufficient to confer the court with personal jurisdiction without offending due process." *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 124 (S.D.N.Y. 2020) (cleaned up). The three websites that comprise Anna's Archive have over 40 million monthly visitors, nearly 20 percent of whom are in the United States; indeed, more of Anna's Archive's users are in the United States than are in any other country, making the United States Anna's Archive's single largest market. McDevitt Decl. ¶ 9.

cover art that it scraped from Spotify, including album cover art for which the copyrights are owned or exclusively controlled in the U.S. by the Record Company Plaintiffs. McDevitt Decl. ¶¶ 12-13.

A plaintiff may establish irreparable harm by either showing that "the loss is difficult to replace or measure" or that "plaintiffs should not be expected to suffer the loss." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012). Copyright infringement results in irreparable harm when unauthorized distribution of a work on the Internet would "substantially diminish [its] value," the copyright owners' "losses would be difficult to measure," and the defendant "would be unable to pay damages should [the copyright owner] prevail." *Id.* While irreparable harm may not be presumed, the Second Circuit has acknowledged that, because proving lost sales due to infringement is "notoriously difficult," courts have tended to "readily" issue preliminary injunctions in copyright cases. *See Salinger v. Colting*, 607 F.3d 68, 81–2 (2d Cir. 2010) (internal citations and quotations omitted).

Every indicia of irreparable harm identified by the Second Circuit is present here. The Record Company Plaintiffs' business models rely substantially upon the licensing of their catalogs of sound recordings to legitimate streaming services. *See* McMullan Decl. ¶ 6; Cohen Decl. ¶ 6; Jacoby Decl. ¶ 6. If consumers can download and stream the Record Company Plaintiffs' catalogs of sound recordings for free, they will have little incentive to pay for streaming services and licensees will have little incentive to pay the Record Company Plaintiffs to license their music. *See id.* If the Record Company Plaintiffs cannot control the licensing or distribution of their sound recordings, or if those sound recordings are made available for free elsewhere, the Record Company Plaintiffs will be unable to charge a fair market rate for their copyrighted works. *See* Cohen Decl. ¶ 7, Ex. A; Jacoby Decl. ¶ 7, Ex. A; McMullan Decl. ¶ 7,

Ex. A. Illegal, widespread distribution of the Copyrighted Sound Recordings (along with the many other unlawfully obtained music files in which the Record Company Plaintiffs have rights) would undoubtedly "substantially diminish" the value of those sound recordings. *See WPIX*, 691 F.3d at 285. Moreover, given the uncontrolled and decentralized nature of Anna's Archive and the viral nature of dissemination of files through the BitTorrent network, the losses to the Record Company Plaintiffs would be extremely difficult to measure and "cannot be calculated with precision." *Id.*; McDevitt Decl. ¶ 4, fn. 2; Cohen Decl. ¶ 8; Jacoby Decl. ¶ 8; McMullan Decl. ¶ 8.

Even if a dollar amount could somehow be assigned to the enormous harm that would be caused by illegally distributing millions of sound recordings through the decentralized BitTorrent network, Anna's Archive could not, and would not, pay that amount. Anna's Archive, formerly known as the "Pirate Mirror Library," admits that it "deliberately violate[s] the copyright law in most countries." Ransom Decl., Ex. G at 1. It relies on donations in the form of cryptocurrency and gift cards because it cannot access traditional financial institutions. *Id.*, Ex. D at 1-2; McDevitt Decl., Ex. C at 2. And its operators recognize that they "need to stay anonymous" because they could otherwise face serious legal consequences, including "decades of prison time." *Id.*; Ransom Decl., Ex. H at 2. Accordingly, the issue is not merely that Anna's Archive lacks the assets to pay a judgment, although that appears to be true and is sufficient on its own to establish irreparable harm. *See WPIX*, 691 F.3d at 285; *Take-Two Interactive Software, Inc. v. Zipperer*, No. 18 Civ. 2608 (LLS), 2018 WL 4347796, at *9 (S.D.N.Y. Aug. 16, 2018) (finding irreparable harm where "there is a high risk that [the defendant] would not be able to satisfy such an award as [they] appear[] to be insolvent"). It is that Anna's Archive is intentionally, and admittedly, designed and operated for the express purpose of circumventing the laws of the

United States and ignoring the orders and judgments of courts like this one. Only prospective

relief can prevent the irreparable harm that will inevitably result if Anna's Archive is permitted

to illegally distribute the Record Company Plaintiffs' copyrighted works. This factor likewise

strongly supports injunctive relief.

>    **D.    The Balance of the Equities Strongly Favors Legal Copyright Holders Like
>           the Record Company Plaintiffs Over Willful Infringers.**

The balance of hardships also weighs decisively in favor of injunctive relief. The only

"hardship" that Anna's Archive would suffer is complying with the law and ceasing its

infringement of the Record Company Plaintiffs' copyrights. But "[i]t is axiomatic that an

infringer of copyright cannot complain about the loss of ability to offer its infringing product."

*WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 621 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir.

2012); *accord Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 553 (S.D.N.Y. 2008).

Even if an injunction would put Anna's Archive "out of business," that is not an argument

against issuing it, because Anna's Archive's business is breaking the law. *See WPIX*, 765 F.

Supp. 2d 594, 621; Ransom Decl., Ex. G at 1 (admitting that Anna's Archive "deliberately

violate[s] the copyright law in most countries"). The irreparable harm to the Record Company

Plaintiffs thus vastly outweighs the lack of any legally cognizable harm whatsoever to Anna's

Archive, and the balance of equities favors the requested relief.

>    **E.    The Public Interest Strongly Favors Enforcement of the Law and the Record
>           Company Plaintiffs' Rights.**

Finally, injunctive relief against continued infringement by Anna's Archive is in the

public interest. "[T]he public has a compelling interest in protecting copyright owners'

marketable rights to their work." *WPIX*, 691 F.3d at 287; *accord CJ Prods. LLC v. Snuggly*

*Plushez LLC*, 809 F. Supp. 2d 127, 146 (E.D.N.Y. 2011) ("[I]t is uncontested that there exists a

strong policy in favor of defending copyrights."). The purpose of copyright law is to create the

economic incentive that leads to the creation of "new expression" like the sound recordings that Anna's Archive illegally copied and is now threatening to imminently distribute. *See Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). If the Record Company Plaintiffs' copyrighted sound recordings "could be copied and streamed over the Internet in derogation of their exclusive property rights," then the incentive to create new recordings (like the millions of recordings Anna's Archive stole from Spotify) "surely would be dampened." *See WPIX*, 691 F.3d at 288. Injunctive relief here is essential to protect the public policies underlying copyright law.

In sum, each of the factors for issuing a temporary restraining order weighs decisively in favor of the Record Company Plaintiffs. Absent immediate intervention from the Court, the Record Company Plaintiffs will suffer irreparable harm to their copyright interests in countless sound recordings, including the Copyrighted Sound Recordings.

## II. The Court Is Authorized to Direct Cooperation by Third Parties, Including Domain Registrars and Web Hosting Providers.

The temporary restraining order should also direct PIR and Cloudflare to cooperate in effectuating the order, particularly in light of the decentralized structure of Anna's Archive's operations and the admittedly unlawful nature of its conduct. Specifically, the Record Company Plaintiffs' [Proposed] Order directs PIR to "lock" the annas-archive.org domain name and directs Cloudflare to disable the authoritative nameservers for the annas-archive.li and annas-archive.se websites. These third parties are the only entities in the United States that can effectively disable Defendant's domains and prevent the immediate and irreparable harm to the Record Company Plaintiffs caused by Defendant's ongoing operation of these websites. Cooperation from PIR and Cloudflare is thus necessary to effectuate the relief sought here. In similar cases, courts have regularly directed the cooperation of third-party domain registries and service providers, including PIR and Cloudflare, in orders for preliminary and permanent injunctive relief. *See,*

*e.g.*, *N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. LTD. Co.*, No. 10 Civ. 1630 (AKH), 2011 WL 12908845, at *2 (S.D.N.Y. June 24, 2011) ("Public Interest Registry . . . cannot continue to make the connections that enable customers attracted to defendants' websites to access those websites."); *Arista Recs., LLC v. Tkach*, 122 F. Supp. 3d 32, 38 (S.D.N.Y. 2015) (requiring Cloudflare to comply with TRO issued against defendants because, among other things, "Cloudflare admittedly owns and operates the authoritative domain name server for the [defendants'] sites, which connects users entering the . . . domain names into a web browser to the specific IP address associated with that site"); *see also Microsoft Corp. v. Tu*, No. 23 Civ. 10685 (PAE), 2024 WL 4516416, at *4 (S.D.N.Y. Aug. 29, 2024) (requiring Cloudflare to suspend "all services to Defendants or Defendants' representatives or resellers associated with the [relevant] domains"); *Microsoft Corp. v. Does 1-2*, No. 20 Civ. 1217 (LDH) (RER), 2021 WL 4260665, at *4 (E.D.N.Y. Sept. 20, 2021) (requiring "Public Interest Registry . . . [to] take reasonable steps . . . to prevent the domains from being controlled by the Defendants or third parties").[2]

The Record Company Plaintiffs request this relief pursuant to the All Writs Act ("AWA"), which provides that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The power conferred by the AWA extends, in "appropriate circumstances," to "persons who,

---

[2] *See also Tangle, Inc. v. Individuals, Corps., Ltd. Liab. Cos., Partnerships, & Unincorporated Assocs. Identified on Schedule A Hereto*, No. 1:22-CV-02350, 2022 WL 1125278, at *3 (S.D.N.Y. Apr. 14, 2022); *Richemont Int'l SA v. Long*, No. 13-CV-9071, 2014 WL 12543815, at *4 (S.D.N.Y. July 11, 2014); *Warner Bros. Ent. Inc. v. Doe*, No. 14-CV-3492 (KPF), 2014 WL 12543818, at *3 (S.D.N.Y. May 29, 2014); *Advanced Access Content Sys. Licensing Adm'r, LLC v. Shen*, No. 14-cv-1112 (VSB), slip op. at 3 (S.D.N.Y. Mar. 4, 2014) (Dkt. No. 21); *True Religion Apparel, Inc. v. Xiaokang Lei*, No. 11-cv-8242 (HB), slip op. at 6-7, 9-10, 14-15 (S.D.N.Y. Nov. 17, 2011) (Dkt. No. 7).

though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *Makekau v. State*, 943 F.3d 1200, 1205 (9th Cir. 2019) (quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977)). Notably, "[s]uch jurisdiction may 'encompass even those who have not taken any affirmative action to hinder justice.'" *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 414 (2d Cir. 2002) (citation omitted). This "grant of authority to enjoin and bind non-parties to an action," when "needed to preserve the court's ability to . . . enforce its decision," is "[a]n important feature of the All-Writs Act." *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 338 (2d Cir. 1985); *see also* 17 U.S.C. § 502(a) (authorizing a court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright").

There are two steps to analyzing application of the AWA to third parties. The Court must first determine whether the threshold requirements are met: (1) issuance of the writ must be "in aid of" the issuing court's jurisdiction, (2) the type of writ requested must be "necessary or appropriate" to provide such aid to the issuing court's jurisdiction, and (3) the issuance of the writ must be "agreeable to the usages and principles of law." *See United States v. Amante*, 418 F.3d 220, 222 (2d Cir. 2005); *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 863 (2d Cir. 1988); 28 U.S.C. § 1651. If these requirements are satisfied, then courts, in their discretion, evaluate three further factors: (1) the "closeness" of the third party's relationship to the defendant's illegal conduct; (2) "the burden the requested order would impose on [the third party]"; and (3) "the necessity of imposing such a burden on [the third party]." *In re Apple, Inc.*, 149 F. Supp. 3d 341, 344, 351 (E.D.N.Y. 2016); *see also United States v. New York Tel. Co.*, 434 U.S. 159, 174-78 (1977).

The threshold requirements are plainly satisfied. As to the first, this action is brought under multiple federal statutes, including—as to the emergency injunctive relief sought here—the Copyright Act. Accordingly, the Court "unquestionably has subject matter jurisdiction over this action pursuant to 28 U.S.C. Section 1331, and, therefore, has jurisdiction to issue the requested [AWA] Order." *United Spinal Ass'n v. Bd. of Elections in City of N.Y.*, No. 10 Civ. 5653 (DAB) (HBP), 2017 WL 8683672, at *5 (S.D.N.Y. Oct. 11, 2017), *report and recommendation adopted*, 2018 WL 1582231 (S.D.N.Y. Mar. 27, 2018). Second, this Court's utilization of the AWA is "necessary or appropriate." As the Supreme Court has recognized, "[u]nless appropriately confined by Congress, a federal court may avail itself of all auxiliary writs as aids in the performance of its duties." *N.Y. Tel. Co.*, 434 U.S. at 172-73. The temporary restraining order sought here is particularly necessary and appropriate given the decentralized structure of Defendant and avowedly lawless nature of its conduct, McDevitt Decl.¶ 4; Ransom Decl., Ex. G, along with Defendant's reliance on the services of third parties to accomplish its illegal activities.

Third, the Record Company Plaintiffs' [Proposed] Order comports with appropriate principles of law. If the first two requirements are met, the AWA empowers the court "to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction." *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 335 (S.D.N.Y. 2007) (quoting *In re Baldwin*, 770 F.2d at 338). Here, Anna's Archive is a collection of anonymous and elusive pirate websites whose hosting providers are unknown or located outside of the United States. McDevitt Decl. ¶¶ 4, 21. An order that merely enjoins Defendant—but that does not also direct cooperation

by PIR and Cloudflare to effectuate that order—will leave this Court and the Record Company Plaintiffs effectively unable to enforce the order. McDevitt Decl. ¶ 24.

For much the same reasons, Plaintiffs' [Proposed] Order also (1) does not "unreasonabl[y] burden[]" the third parties at issue; (2) is "necessary" and "essential to the fulfillment of the purpose" of this Court's Order; and (3) does not enjoin third parties that are "so far removed from the underlying controversy that [their] assistance could not be permissibly compelled." *N.Y. Tel. Co.*, 434 U.S. at 172-78; *see also Microsoft Corp. v. Tu*, 2024 WL 4516416, at *3 (extending permanent injunction to Cloudflare pursuant to the AWA); *Microsoft Corp. v. Does 1-2*, 2021 WL 4260665, at *4 (extending permanent injunction to PIR pursuant to the AWA).  First, requiring PIR and Cloudflare to disable the relevant infrastructure and connectivity on which Defendant's websites rely imposes minimal burdens. The Record Company Plaintiffs' [Proposed] Order is also narrowly tailored, requires that it be implemented with only the least degree of interference with the third parties' normal operations, and does not deprive the third parties of any tangible or significant property interests. *Id.* Second, as discussed above, the writ requested is necessary to effectuate the [Proposed] Order, the purpose of which is to prevent Defendant from mass releasing the 86 million music files it brazenly and illegally "scraped" from Spotify, thereby protecting the Record Company Plaintiffs' intellectual property rights. Just as the surveillance authorized in *New York Telephone* could not have been accomplished without the participation of the telephone company, the reasonable cooperation of PIR and Cloudflare is required to prevent Defendant's imminent and illegal distribution of these sound recordings. *See In re Application of United States for an Order Authorizing an In-Progress Trace of Wire*, 616 F.2d 1122, 1129 (9th Cir. 1980) ("[T]he Court [in *New York Telephone*] made the commonsense observation that, without the participation of the telephone

company, 'there is no conceivable way in which the surveillance authorized . . . could have been successfully accomplished.'") (alteration in original) (*quoting N.Y. Tel. Co*., 434 U.S. at 175). Third, PIR and Cloudflare, whose infrastructures and services Defendant uses for their illegal activities, are not "so far removed" from that illegal activity that their assistance cannot reasonably be compelled. *See N.Y. Tel.*, 434 U.S. at 174. Indeed, PIR and Cloudflare play a critical and controlling role in connecting users to Anna's Archive—a necessary step in allowing Defendant to operate and to perpetuate its infringement. *See* McDevitt Decl. ¶¶ 22-23; *see also* cases cited *supra* at 16 & n.2.

In sum, the directions to the third parties in the [Proposed] Order are narrow, satisfy due process, and are necessary to effectuate the Record Company Plaintiffs' requested relief and to ensure that the relief is not rendered fruitless.

## III.    The Temporary Restraining Order Must Be *Ex Parte*.

Under the circumstances presented here, the temporary restraining order that the Record Company Plaintiffs request must be issued *ex parte* for the relief in that order to be effective. Rule 65 authorizes courts to enter a temporary restraining order *ex parte* where, as here, the moving party sets forth facts that show an immediate and irreparable injury and why notice should not be required. Fed. R. Civ. P. 65(b)(l); *see also In re Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979) (per curiam) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Loc. No. 70*, 415 U.S. 423, 439 (1974)). Under this rule, an order may be issued without notice if (1) "an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result" before hearing from the adverse party, and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(l). A temporary restraining order "may be ordered on an *ex parte* basis under subdivision (b) if the applicant makes a strong showing of the reasons why notice is

likely to defeat effective relief." Fed. R. Civ. P. 65 Comm. Notes on Rules.[3] As such, even where notice could have been given to the adverse party, *ex parte* orders are proper when notice "appears to serve only to render fruitless further prosecution of the action." *In re Vuitton*, 606 F.2d at 5; *see also Granny Goose Foods*, 415 U.S. at 439. Notably, courts have consistently recognized the need for granting *ex parte* TROs against violators of intellectual property rights, and copyright infringers in particular. *See, e.g., XYZ Corp. v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated Ass'ns Identified on Schedule A,* No. 24-CV-4428 (LLS), 2024 WL 3718106 (S.D.N.Y. Aug. 6, 2024); *Tangle, Inc. v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated Ass'ns Identified on Schedule A*, Case No. 1:22-cv-2350 (VEC), (S.D.N.Y. Mar. 23, 2022) (Dkt. No. 18); *True Religion Apparel, Inc. v. Xiaokang Lei*, No. 11-cv-8242 (HB), slip op. at 14-15 (S.D.N.Y. Nov. 17, 2011) (Dkt. No. 7); *U2 Home Entm't, Inc. v. Bowery Music City, Inc.*, No. 03 Civ. 8909 (RJH), 2003 WL 22889738, at *1 (S.D.N.Y. Dec. 8, 2003); *see also Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 554 (9th Cir. 1992); *ABS-CBN Int'l v. Freepinoychannel.com*, No. 15-61002-civ-Dimitrouleas/Snow, 2015 WL 11069997, at *4-6 (S.D. Fla. May 15, 2015); *Datatech Enters., LLC v. FF Magnat Ltd*, No. 12-cv-4500 (CRB), slip op. at 2-3 (N.D. Cal. Aug. 28, 2012) (Dkt. No. 9); *Shutterfly, Inc. v. ForeverArts, Inc.*, No. CR 12-3671 (ST), 2012 WL 2911887, at *3-4 (N.D. Cal. July 13, 2012).

Such relief is similarly appropriate here. As described above, Defendant is an avowed "pirate" whose intent and purpose is to ignore copyright law. If the Record Company Plaintiffs were required to give notice of their motion for temporary restraining order to Defendant,

---

[3] Similarly, this Court's Local Rule 6.1(d) requires "a clear and specific showing by affidavit that contains good and sufficient reasons why a procedure other than by notice of motion is necessary and states whether a previous application for similar relief has been made." L.R. 6.1(d). For the reasons set forth herein, the Record Company Plaintiffs have met that standard as well. *See* Ransom Decl. ¶ 5.

Defendant could take immediate steps to preemptively thwart the emergency relief sought in that motion. Such steps could include the immediate posting of torrent files enabling the mass distribution of the millions of sound recordings that Defendant illegally scraped from Spotify— *i.e.*, the very action that Plaintiffs seek to preclude through this lawsuit. Defendant could also quickly change service providers, including to wholly distance the operations of Anna's Archive from the United States, in a further effort to interfere with Plaintiffs' protection and enforcement of their rights. Indeed, Anna's Archive has already alluded to taking such steps if needed, indicating in a blog post published on March 19, 2023, that it has contingency plans in place if its access to its current service providers is threatened. McDevitt Decl. ¶ 26, Ex. C (Anna's Archive blog post identifying the "risk" that hosting providers will "shut[] down" its shadow library).

In short, with notice of the relief sought here, Defendant could, and likely would, render this action meaningless before it has even meaningfully commenced. *Ex parte* relief is not only appropriate under these circumstances; it is critical. *See, e.g.*, *In re Vuitton*, 606 F.2d at 2 (plaintiff's "[prior] experience . . . taught it that once one member of this community of counterfeiters learned that he had been identified by [plaintiff] and was about to be enjoined from continuing his illegal enterprise, he would immediately transfer his inventory to another counterfeit seller, whose identity would be unknown to [plaintiff]"); *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d at 34 (discussing how plaintiffs were drawn into a "technological globetrotting game of 'whack-a-mole'" in an effort to enforce injunction against online copyright and trademark infringers); *see also AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1319–20 (11th Cir. 2004) (affirming *ex parte* search and seizure order to seize contraband technical equipment, given evidence that, in the past, defendants and persons similarly situated had secreted evidence once notice given); *ABS-CBN Int'l Corp.*, 2015 WL 11069997, at *3

(granting *ex parte* TRO because "if Plaintiffs proceed on notice to Defendants . . . Defendants can easily and quickly transfer the registrations for many of the Subject Domain Names").

To ensure that the *ex parte* relief is strictly limited to "serving [its] underlying purpose," *Granny Goose Foods*, 415 U.S. at 439, as soon as the temporary restraining order is served on PIR and Cloudflare, and they have confirmed their compliance with it, the Record Company Plaintiffs will undertake to promptly provide actual notice to Anna's Archive of the temporary restraining order and preliminary injunction hearing, and to effect service of the Complaint, temporary restraining order, and other papers in this action in the manner described below.

## IV.    The Record Company Plaintiffs' Request for a Security Bond in the Amount of $5,000 Is Adequate.

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Proc. 65(c).  In determining the amount of security, this Court is "vested with wide discretion." *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (citation omitted). The Record Company Plaintiffs respectfully submit that a bond in the amount of $5,000 is adequate and appropriate under the circumstances. *Tangle, Inc.*, 2022 WL 1125278, at *5.

## V.    The Court Should Authorize Plaintiffs to Serve Process by Email.

When service on Anna's Archive is appropriate, the Record Company Plaintiffs request permission to serve Anna's Archive by email. Plaintiffs have been unable to identify any other viable contact information for Anna's Archive, which exists entirely online and communicates with the public entirely by electronic means (and which routinely touts with pride the anonymity with which it operates). McDevitt Decl. ¶ 27, Ex. C at 2. The domain name registrations

associated with two of Anna's Archive's domains provide no registrant information at all—no corporate names, contact names, business addresses, or telephone numbers. McDevitt Decl. ¶¶ 18, 27. The third domain registration also does not include a contact name, email address, or telephone number, and the company name, "Cyberdyne S.A.," and address in Liberia provided are of dubious authenticity. *Id.* The websites associated with Anna's Archive also do not have "contact us" pages that provide any contact information that can be attributed to a real person. *Id.* ¶ 28. Thus, notwithstanding diligent efforts, Plaintiffs have not been able to identify any meaningful contact information for Anna's Archive or any person associated with it other than the anonymous email addresses noted above. *See supra* at 6.

It does appear, however, that Anna's Archive operates from outside of the United States. Among other things, Anna's Archive registered the domain names for its websites using various foreign domain registrars and listed one purported physical address in Liberia. McDevitt Decl. ¶ 18. Under Rule 4(f)(3) of the Federal Rules of Civil Procedure, this Court may authorize service of process on an individual in a foreign country by any means—including email—so long as such service is not prohibited by international agreement with the country where the Defendants are to be served. *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014-19 (9th Cir. 2002) (holding that the only limitations on service under Rule 4(f)(3) are that such service be "(1) directed by the court; and (2) not prohibited by international agreement").[4]

---

[4] Moreover, because "service of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief," but instead "is merely one means among several which enables service of process on an international defendant" *Rio Props.*, 284 F.3d at 1015 (cleaned up), Rule 4 does not require that a party first attempt service of process by those methods enumerated in Rule 4(f)(2) before petitioning the Court for permission to serve process by alternate means under Rule 4(f)(3). *Id.* at 1014-15.

Service of process by email is not prohibited by international agreement here—the only listed registrant address for any of Anna's Archive's domains (though it is of questionable veracity) is in Liberia, McDevitt Decl. ¶ 18, 27, and Liberia is not a party to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, nor any other international agreement regarding service of process. *See* U.S. Department of State, Legal Resources, Liberia Judicial (available at https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/Liberia.html) (last visited Dec. 28, 2025). Moreover, service by email is particularly *appropriate* here. Courts have found service by email suitable where, as here, defendants are conducting illicit operations solely via the Internet while concealing their true physical addresses and identities. *See, e.g.*, *Philip Morris USA Inc. v. Veles Ltd.*, No. 06 CV 2988 (GBD), 2007 WL 725412, at *1-3 (S.D.N.Y. Mar. 12, 2007) (service by email appropriate and satisfies due process where defendants "appear to be foreign corporations of unknown citizenship" with "[n]o physical contact addresses . . . posted on their websites" and no valid physical addresses registered to websites' domain names); *Cengage Learning v. Doe 1*, Case No. 18-cv-403 (RJS), 2018 WL 2244461, at *4 (S.D.N.Y. Jan. 17, 2018) (service by email appropriate where it is unknown "whether Defendants reside in the United States or in a foreign country" and "Defendants appear to have concealed their true identities and contact information"); *see also Hydentra Hlp Int. Ltd. v. Porn69.org*, No. CV15-00451-PHX DGC, 2015 WL 8064770, at *1-2 (D. Ariz. Dec. 7, 2015) (service by email appropriate where foreign defendants have unknown or "fake physical address[es]"). Indeed, "when faced with an international e-business scofflaw, playing hide-and-seek with the federal court, email may be the only means of effecting service of process." *Rio Props.*, 284 F.3d at 1018. That is precisely the case here.

Accordingly, the Court should grant Plaintiffs leave to serve Anna's Archive process via the email addresses identified on the Anna's Archive websites, namely, annadmca@proton.me and ArchivistAnna3+7oBz9nJ+nt@proton.me. If further contact information for Defendant is discovered, Plaintiffs are willing to serve via additional means as well.

## CONCLUSION

For the reasons set forth herein, the Record Company Plaintiffs respectfully request that this Court grant their motion for a Temporary Restraining Order and Order to Show Cause regarding why a preliminary injunction should not issue. The Record Company Plaintiffs further request that the Court permit notice of the preliminary injunction hearing and service of the Complaint by alternative means.

Respectfully submitted,

Dated: December 29, 2025

*/s/ Randi W. Singer*
Rollin A. Ransom (*pro hac vice forthcoming*)
Lauren M. De Lilly (*pro hac vice forthcoming*)
SIDLEY AUSTIN LLP
350 South Grand Street
Los Angeles, CA 90071
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
Email: rransom@sidley.com
Email: ldelilly@sidley.com

Randi W. Singer (SBN 2946671)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: randi.singer@sidley.com

*Attorneys for Plaintiffs*

## **WORD COUNT VERIFICATION**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 8,280 words, excluding the caption, table of contents, table of authorities, signature block, and this verification. This brief complies with Local Rule 7.1(c).

Respectfully submitted,

Dated: December 29, 2025

*/s/ Randi W. Singer*
Rollin A. Ransom (*pro hac vice forthcoming*)
Lauren M. De Lilly (*pro hac vice forthcoming*)
SIDLEY AUSTIN LLP
350 South Grand Street
Los Angeles, CA 90071
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
Email: rransom@sidley.com
Email: ldelilly@sidley.com

Randi W. Singer (SBN 2946671)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: randi.singer@sidley.com

*Attorneys for Plaintiffs*