UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATLANTIC RECORDING CORPORATION; ATLANTIC MUSIC GROUP LLC; BAD BOY RECORDS LLC; ELEKTRA ENTERTAINMENT LLC; ELEKTRA ENTERTAINMENT GROUP INC.; FUELED BY RAMEN LLC; WARNER MUSIC INTERNATIONAL SERVICES LIMITED; WARNER RECORDS INC.; WARNER RECORDS LLC; SONY MUSIC ENTERTAINMENT; ARISTA MUSIC; ARISTA RECORDS, LLC; ZOMBA RECORDING LLC; UMG RECORDINGS, INC.; CAPITOL RECORDS, LLC; and SPOTIFY USA INC., <br><br> Plaintiffs, <br><br> v. <br><br> ANNA'S ARCHIVE and DOES 1-10, <br><br> Defendants. | No. _____ <br><br> **DECLARATION OF MARK MCDEVITT IN SUPPORT OF PLAINTIFFS' APPLICATION FOR ORDER TO TEMPORARILY FILE CASE UNDER SEAL AND MOTION FOR AN EMERGENCY *EX PARTE* TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** <br><br> **[FILED UNDER SEAL]** |

I, Mark McDevitt, declare and state, pursuant to 28 U.S.C. § 1746 and Local Civil Rule 1.9 of the United States District Courts for the Southern and Eastern Districts of New York, that the following is true and correct:

1. I am Deputy Chief, Content Protection, at the Recording Industry Association of America ("RIAA"). The RIAA is a nonprofit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it in the United States. RIAA members create, manufacture, and/or distribute sound recordings representing the majority of all legitimate recorded music consumption in the United States, and own copyrights and/or other exclusive U.S. rights in sound recordings embodying the

performances of some of the most popular and successful recording artists of all time. I have worked at the RIAA since 1997, exclusively in the field of content protection with a particular focus on the online piracy of copyrighted sound recordings.

2. One of my main job responsibilities at the RIAA includes overseeing the day-to-day operations of the RIAA's content protection program. This program is focused on protecting the intellectual property of RIAA member companies from infringement online. In my capacity as Deputy Chief, Content Protection at the RIAA, I work closely with content protection personnel at our member record companies, including at all of the record-company Plaintiffs in this action.

3. I submit this declaration in support of: (1) Plaintiffs Atlantic Recording Corporation, Atlantic Music Group LLC, Bad Boy Records LLC, Elektra Entertainment LLC, Elektra Entertainment Group Inc., Fueled By Ramen LLC, Warner Music International Services Limited, Warner Records Inc., Warner Records LLC, Sony Music Entertainment, Arista Music, Arista Records, LLC, Zomba Recording LLC, UMG Recordings, Inc., and Capitol Records, LLC's (collectively, the "Record Company Plaintiffs") Application for Order to Temporarily File Case Under Seal, and (2) the Record Company Plaintiffs' Motion for an Emergency *Ex Parte* Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction. The statements made in this declaration are based on my personal knowledge or on my information and belief, as set forth below. If called to testify as a witness, I would testify as follows:

### Anna's Archive

4. By virtue of my work at the RIAA, I am familiar with Anna's Archive. Anna's Archive is a collection of notorious pirate websites that bills itself as "the world's largest shadow

library."[1]  In reality, it is an organization largely dedicated to the unauthorized reproduction and distribution of copyrighted works.  Among other unlawful activity, Anna's Archive routinely tracks the availability of copyrighted content on a peer-to-peer ("P2P") file-sharing network known as "BitTorrent," creates files (known as "torrent" files) enabling BitTorrent users to download copies of copyrighted works illegally, makes infringing content available on BitTorrent for others to download (known as "seeding"), and distributes that content to other BitTorrent users.  BitTorrent is an especially pernicious form of P2P file sharing that is overwhelmingly used for the infringing reproduction and distribution of copyrighted material.[2]

5.    Some basic familiarity with the BitTorrent protocol is helpful.  A piece of software on a user's device providing access to the BitTorrent network is called a "client."

---

[1] https://annas-archive.org/blog/.

[2] As one court of appeals recently explained:

> Peer-to-peer ("P2P") file-sharing networks have existed for decades and enable internet users to copy and distribute digital files directly to each other. Notable examples over the years include Napster, Grokster, KaZaA, and LimeWire. P2P networks have been used to facilitate the unauthorized distribution of copies of copyrighted works. Each of the P2P networks mentioned above was sued by copyright owners for secondary copyright infringement, adjudicated to be liable, and shut down as a result.
>
> P2P networks have evolved over time, making them increasingly difficult for copyright owners to police. Plaintiffs argued at trial that the P2P network BitTorrent substantially limits the ability of copyright owners to protect their rights in two important ways. First, BitTorrent is decentralized, meaning that no single company or entity manages the distribution of its software. Thus, there is no "BitTorrent" entity that can be sued like Napster or Grokster were. Second, BitTorrent is "anonymous," meaning that its users cannot be identified by their names or physical addresses. Rather, BitTorrent identifies users only by their "IP addresses," which are unique strings of characters identifying particular devices connected to networks run by various ISPs. Only the ISPs operating those networks possess the records necessary to match specific IP addresses to specific internet users.

*UMG Recordings v. Grande Commc'ns Networks*, 118 F.4th 697, 702-03 (5th Cir. 2024).

There are many different BitTorrent clients available online. A client is required to access content from the BitTorrent network. When a user opens a "torrent" file using the client, the user's device becomes a peer that is connected to a network of other peers also using BitTorrent, which is known as a "swarm." Members of a swarm can then upload and download files from each other.

6. Files distributed on the BitTorrent network are divided into segments called "pieces." When a BitTorrent user tries to download a file, the client generally downloads different pieces of the file from multiple peers simultaneously. When a user has every piece of a particular file and makes that entire file available for others to download, that user is known as a "seed" for that file.

7. To download a file from the BitTorrent network, the user must separately obtain a torrent file, which is a type of file used by the client software to match the content sought with other peers in the swarm who are offering that content or have pieces of it. A torrent can identify a single file for downloading (e.g., an MP3 file containing a single sound recording) or, more commonly, a group of files (e.g., a collection made up of multiple sound recordings in multiple MP3 files). When a user opens a torrent file through his or her client, the client will connect the user's device with other peers to download pieces of the content identified by that torrent file until all the pieces have been downloaded. Given this structure, distribution of content through the BitTorrent network tends to be "viral," in that the content can spread quickly and widely across the internet, reaching a massive audience in a very short time.

8. Anna's Archive has been a defendant in numerous legal actions for its acts of piracy worldwide and has been the subject of court orders requiring internet services providers

("ISPs") to block their users' access to Anna's Archive in the United Kingdom, the Netherlands, Belgium, Germany, and Italy.

9. According to data from the website tracking service Similarweb, the three primary websites that comprise Anna's Archive collectively have over 40 million monthly visitors, nearly 20 percent of whom are in the United States. More of Anna's Archive's users are in the United States than are in any other country, making the United States Anna's Archive's single largest market.

10. Historically, Anna's Archive has focused its operations on books and other text-based works. However, on December 20, 2025, Anna's Archive published a blog post indicating that it had expanded its operations to copyrighted sound recordings.[3] In that blog post, Anna's Archive claimed it had "discovered a way to scrape Spotify at scale," and that it had downloaded from Spotify "around 86 million music files, representing around 99.6% of listens" on Spotify's platform. Based on my understanding of the encryption and digital rights management tools that Spotify uses with respect to the sound recordings available for streaming on its platform, this "scraping" process likely involved the unauthorized circumvention of technological protection measures that Spotify employs to prevent such copying and downloading. The blog post further claimed that Anna's Archive had downloaded metadata associated with "256 million tracks" on Spotify, as well as an unspecified amount of album art. A true and correct copy of that blog post is attached hereto as Exhibit A.

11. The "86 million music files" Anna's Archive claims to have obtained from Spotify include large numbers of sound recordings for which the copyrights are owned or exclusive U.S. rights are controlled by Plaintiffs in this action. Anna's Archive claimed that it

---

[3] *See* https://annas-archive.org/blog/backing-up-spotify.html.

"primarily used Spotify's 'popularity' metric to prioritize tracks" for copying. Any such methodology would inevitably and overwhelmingly include sound recordings owned by Plaintiffs, given the well-known popularity of Plaintiffs' sound recordings and their prevalence on the major music industry charts. Moreover, Anna's Archive posted a specific list of what it claimed were "the top 10,000 most popular songs" – purportedly according to Spotify's metrics – that Anna's Archive claims to have downloaded from Spotify. That list includes thousands of the most popular sound recordings in the world, many of which are widely known to be owned by the Plaintiffs (including based on "credits" displayed through the Spotify platform that identify Plaintiffs as the owners). A true and correct copy of that list published by Anna's Archive is appended hereto as Exhibit B.

12. Also on December 20, 2025, Anna's Archive posted a torrent file to its website that enabled the downloading of some of the metadata it scraped from Spotify.

13. On December 22, 2025, Anna's Archive posted two additional torrent files to its website.[4] One such file enabled the downloading of additional data purportedly obtained from Spotify. The other enabled the downloading of album cover art, including album cover art for which the copyrights are owned or exclusively controlled by Plaintiffs.

14. While Anna's Archive has not yet posted torrent files enabling the downloading of any of the sound recordings it claims to have obtained from Spotify, it has indicated that it intends to do so imminently. In its December 20 blog post, Anna's Archive said it would release torrent files for "music files (releasing in order of popularity)." The blog post also said that "if there is enough interest, we could add downloading of individual files to Anna's Archive."

---

[4] *See id.*

15.     If Anna's Archive were to post torrent files for the sound recordings it claims to have scraped (*i.e.*, reproduced) from Spotify, it would enable anyone with an internet connection to download those recordings for free using BitTorrent, all without the authorization of any of the Plaintiffs in this action.

## Anna's Archive's Web Architecture

16.     By virtue of my work at the RIAA, I am also familiar with the general architecture of the Internet, including the role that domain names play and many of the services that are available to website operators to mask their identities. Indeed, many online infringers use such services to conceal themselves and attempt to evade detection.

17.     Anna's Archive currently operates three principal websites offering the above-referenced torrent files: annas-archive.org; annas-archive.li; and annas-archive.se. The ".org" top-level domain is operated by the Public Interest Registry, a nonprofit organization based in Reston, Virginia. The ".li" top-level domain is reserved for the country of Liechtenstein, and the ".se" top-level domain is reserved for the country of Sweden. However, it is not necessary for a website operator to have any association with either country to acquire and use domain names within the ".li" or ".se" top-level domains.

18.     As best as I can determine, Anna's Archive registered the domain names for its websites using various foreign domain registrars and masking the identities of the individual registrants. It appears from WHOIS records that Anna's Archive used the following registrars and registrants for its three principal domain names:

| **Domain Name** | **Registrar** | **Registrar Location** | **Registrant** | **Registrant Location** |
|---|---|---|---|---|
| Annas-archive.org | Tucows Domains Inc. | Canada | Not listed | Unknown |
| Annas-archive.li | Immaterialism Limited | United Kingdom | Not listed | Unknown |

7

| Domain Name | Registrar | Registrar Location | Registrant | Registrant Location |
|---|---|---|---|---|
| Annas-archive.se | Registrar.eu | The Netherlands | Cyberdyne, S.A. | Liberia |

19. Anna's Archive also employs the services of an internet service provider called Cloudflare, Inc. ("Cloudflare") in connection with certain aspects of its websites. Cloudflare, which is headquartered in San Francisco, California, provides a so-called "reverse proxy" service that acts, in effect, as a "middleman" that sits between a website and the users who interact with it. Rather than allow users to contact the server on which the website is hosted directly, Cloudflare receives certain user interactions with the website and relays them through Cloudflare servers to the hosting provider. Because of the presence of Cloudflare's servers, it is impossible to identify the location of the actual server supporting those aspects of the website absent the disclosure of this information by Cloudflare (or by the website operators themselves). According to publicly-available IP address registration records, Cloudflare is currently providing reverse proxy service to both the Annas-archive.li and the Annas-archive.se websites.

20. I understand that Spotify recently submitted a complaint to Cloudflare with regard to Anna's Archive and requested certain information from Cloudflare concerning Anna's Archive's primary websites. I further understand that Cloudflare disclosed to Spotify that the Annas-archive.li website is hosted by an ISP known as "Netulu," and that the Annas-archive.se website is hosted by an ISP known as "IP Vendetta" or "IPv." IPv, which is based in the Seychelles, appears to be an ISP that ignores copyright enforcement efforts. Although very little information is available regarding Netulu (and the website at netulu.com is currently inactive), certain online data suggests that it may be based in Switzerland.

**Curative Steps**

21.     The most direct means of stopping Anna's Archive from its illegal behavior would be to require the hosting providers for the three primary websites to sever communication to or from those websites.  However, because the hosting provider for the Annas-archive.org website is unknown, and because the hosting providers for the Annas-archive.li and Annas-archive.se websites are (according to Cloudflare) located outside of the United States, such direct relief may be difficult or impossible to obtain or enforce.

22.     As noted above, the Annas-archive.org website (which, according to Similarweb data, is far and away the most popular of the three primary websites) uses a domain name with the ".org" top-level domain, which is administered by the Public Interest Registry ("PIR"), a non-profit corporation based in Virginia.  As the top-level domain registry for the ".org" domain, PIR has the technical capability to implement a "lock" on the Annas-archive.org domain name that would prevent it from resolving internet traffic to the underlying website during the pendency of this case.

23.     Moreover, Cloudflare also has the technical capability to prevent Anna's Archive from continuing to use the Annas-archive.li and Annas-archive.se websites for their illegal activities.  As a basic part of the "reverse proxy" service that Cloudflare supplies to the Annas-archive.li and Annas-archive.se websites, Cloudflare provides the "authoritative nameservers" for those websites.  The authoritative nameservers for any given website provide the information necessary for users' computers to convert easily-remembered domain names (such as "Annas-archive.li") to the corresponding numerical Internet Protocol ("IP") address of the server hosting the website.  Computers must address their Internet communications to IP addresses, not domain names.  Accordingly, when a user enters a domain name into his or her browser, the user's

computer will query the Domain Name System to learn the corresponding IP address of the server hosting the website. The Domain Name System relies upon a domain's authoritative nameservers as the ultimate authorities for translating names like "Annas-archive.li" into IP addresses.[5] With an IP address for the Anna's Archive websites obtained from the Domain Name System, the user's browser will then communicate with the server at that IP address. Without the authoritative nameserver, users could not access the website on the basis of the site's domain name.

24. An order from this Court compelling the Public Internet Registry to "lock" the Annas-archive.org domain name, and compelling Cloudflare to disable the authoritative nameservers for the Annas-archive.li and Annas-archive.se websites, would provide meaningful relief from Anna's Archive's ongoing and further imminently threatened infringement of the record-company Plaintiffs' copyrights.

**Advance Notice Would Materially Compromise Plaintiffs' Enforcement Efforts**

25. To the best of my knowledge, Plaintiffs have not publicized that they are seeking the requested relief in this case. If Anna's Archive were to receive notice of this action, it would be highly likely to take all available steps to distance its operations from the United States entirely, directly compromising Plaintiffs' efforts to prevent the infringement of their intellectual property. Indeed, Anna's Archive indicated in a blog post published on March 19, 2023 that it

---

[5] The Domain Name System involves many thousands of servers run by ISPs and other parties. These servers typically save, or "cache," the correlation between a domain name and an IP address for a time on the order of minutes to a day, but within at most 24 to 48 hours, it can be expected that any cached entry will expire and such a server will again consult the authoritative nameserver. Domain registrants usually have two or more redundant authoritative nameservers as a fail-safe. In the cases of both Annas-archive.li and Annas-archive.se, the primary and redundant nameservers are all provided by Cloudflare.

has contingency plans in place if it lost access to some of its service providers.[6]  A true and correct copy of that blog post is appended hereto as Exhibit C.

26.     Given the statements made by Anna's Archive in its March 19, 2023 blog post and my extensive experience with Internet piracy, I believe that it is virtually certain that notice of this action would result in immediate efforts by Anna's Archive to move its operations completely beyond the reach of enforcement in the United States.

### Need For Service By Email

27.     As noted above, RIAA attempted to identify the individuals behind Anna's Archive by searching for the registrant information associated with each of its websites. However, Anna's Archive's domain records generally use privacy protection features to redact details about its registrants and their physical locations.  Indeed, two of the domains—annas-archive.org and annas-archive.li—provide *no* registrant information such as formal business names, contact names, business addresses, or telephone numbers.  Limited registrant information is available regarding the third domain—annas-archive.se—from the Swedish Internet Foundation ("SIF"), which is responsible for the .se domain.  Specifically, the "Search domains" tool at https://internetstiftelsen.se/en/domains/ lists "Cyberdyne S.A." in Monrovia, Liberia as the registrant.  However, that record does not include a contact name, e-mail address, or telephone number, and "Cyberdyne" is also the name of the fictional technology company in the "Terminator" movie series behind the "Skynet" artificial intelligence network that achieved super intelligence and self-awareness, leading to nuclear devastation).  These facts tend to suggest that the registrant information maintained by SIF may be fraudulent.

---

[6] *See* https://annas-archive.org/blog/how-to-run-a-shadow-library.html.

28. Further, the websites associated with Anna's Archive do not have "contact us" pages that provide any contact information that can be attributed to a real person. Instead, in my review of those websites, I was able to locate only two separate email addresses affiliated with Anna's Archive: annadmca@proton.me and ArchivistAnna3+7oBz9nJ+nt@proton.me.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 28, 2025, at Newport Beach, California.

_____
Mark McDevitt