**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr>
<td>

ATLANTIC RECORDING CORPORATION;
ATLANTIC MUSIC GROUP LLC; BAD BOY
RECORDS LLC; ELEKTRA
ENTERTAINMENT LLC; ELEKTRA
ENTERTAINMENT GROUP INC.; FUELED
BY RAMEN LLC; WARNER MUSIC
INTERNATIONAL SERVICES LIMITED;
WARNER RECORDS INC.; WARNER
RECORDS LLC; SONY MUSIC
ENTERTAINMENT; ARISTA MUSIC;
ARISTA RECORDS, LLC; ZOMBA
RECORDING LLC; UMG RECORDINGS,
INC.; CAPITOL RECORDS, LLC; and
SPOTIFY USA INC.,

                    Plaintiffs,

      v.

ANNA'S ARCHIVE and DOES 1-10,

                    Defendants.

</td>
<td>

No. 26-cv-00002 (JSR)

**DECLARATION OF RICHARD
TITMUSS IN SUPPORT OF
PLAINTIFFS' MOTION FOR
DEFAULT JUDGMENT**

</td>
</tr>
</table>

I, Richard Titmuss, declare and state, pursuant to 28 U.S.C. § 1746 and Local Civil Rule 1.9 of the United States District Courts for the Southern and Eastern Districts of New York, that the following is true and correct:

1.      I am Principal Engineer at Spotify AB. Spotify USA Inc. ("Spotify") is a wholly-owned subsidiary of Spotify AB. I make this declaration in support of the Motion for Default Judgment of Plaintiffs Atlantic Recording Corporation, Atlantic Music Group LLC, Bad Boy Records LLC, Elektra Entertainment Group Inc., Elektra Entertainment LLC, Fueled by Ramen LLC, Warner Music International Services Limited, Warner Records Inc., Warner Records LLC, Sony Music Entertainment, Arista Music, Arista Records, LLC, Zomba Recording LLC, UMG

Recordings, Inc., and Capitol Records, LLC (collectively, the "Record Company Plaintiffs"), and Spotify. I have personal knowledge of the following facts, and if called as a witness, could and would testify thereto.

2.      I have worked at Spotify AB since September 2014, in the field of consumer-facing software engineering, including the development and oversight of Spotify's mobile, desktop, and hardware applications. My responsibilities include leading and overseeing engineering efforts related to Spotify's consumer applications, including the systems through which users access and stream copyrighted content, such as streaming protocols, user authentication, and digital rights management. By virtue of my position and role, I am knowledgeable about Spotify's systems that provide authorized access to copyrighted content and the technological measures Spotify employs to protect that content from unauthorized access and use.

3.      Spotify provides widespread authorized access to copyrighted content, while simultaneously taking measures to protect the value of this content. These measures are crucial to Spotify's business model.

4.      Spotify implements a variety of technological measures to protect copyrighted works and prevent users from reproducing or distributing the copyrighted works without authorization. In particular, Spotify applies encryption and other digital rights management ("DRM") protection to each audio file that is made available for streaming through the Spotify platform. The purpose of these technological measures is to control access to these copyrighted works, including without limitation to prevent illegal copying and distribution of the works. Each individual audio file within the Spotify platform is subject to this DRM technology.

5.      I am informed and believe that, on or about, December 20, 2025, Defendant Anna's Archive ("Defendant") published a blog post stating that it had "scraped" (*i.e.*, copied) and "backed

2

up" (*i.e.*, stored) 86 million music files and 256 million metadata files (*e.g.*, track name, album, cover art, and artist) from Spotify. I am further informed and believe that beginning on or around February 9, 2026, the "Torrents" webpage located at annas-archive.li/torrents included links to 47 separate torrents that appeared to identify Spotify music files that Defendant had made available for download through the BitTorrent network.

6.      Spotify personnel opened the first two torrents listed by Defendant and downloaded the files identified in the torrents, which I am informed and believe consist of a total of 120,000 music files (*i.e.*, 60,000 music files per torrent); I then reviewed a sample of those files. Each of the files was playable with a standard media player (*i.e.*, outside of the Spotify platform) and capable of being freely distributed (*e.g.*, emailed to others, posted online, etc.). Based on my review of the files that I sampled, I am informed and believe that the remaining music files that Spotify downloaded are likewise playable and distributable outside of the Spotify platform.

7.      In order to make each of these individual music files available through the BitTorrent network, Defendant necessarily had to circumvent and disable the technological DRM protections that Spotify had implemented with respect to each such music file. Had Spotify's technological DRM protections remained in place, I would not have been able to successfully play or distribute the downloaded audio files outside of Spotify's platform.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 24, 2026, in  STOCKHOLM , SWEDEN  .

Richard Titmuss

3